The CITY OF MOLINE ACRES, a Municipal Corporation, Respondent,

v.

Raymond L. HEIDBREDER and Marcella A. Heidbreder, Appellants.

No. 49611.

Supreme Court of Missouri,

Division No. 2.

April 8, 1963.

Motion for Rehearing or to Transfer to Court En Banc Denied May 13, 1963.

Hamilton & Armstrong, Aubrey B. Hamilton, St. Louis, for appellants.

Val Terschluse and Frank J. Lane, Jr., St. Louis, for respondent.

EAGER, Presiding Judge.

In this proceeding the City of Moline Acres, a municipal corporation, sought to enjoin the defendants from operating a two-family or multiple dwelling unit in an area zoned for single-family dwellings. The trial court issued a permanent injunction accordingly, giving defendants 120 days in which to comply. After an unsuccessful motion for a new trial, defendants appealed. A constitutional question has been present in the case throughout its course, hence our jurisdiction.

The controversy here had its birth in the adoption by the Village of Moline Acres of Ordinance No. 21 as its Zoning Ordinance, on June 6, 1950. At that time this Village, in St. Louis County, consisted of an area running about a mile north and south along Missouri Highway No. 99 (now No. 67) and extending approximately 800 feet to the east and 450 feet to the west, although narrowing down toward the south. This area lay generally between Chambers Road and St. Cyr Road. The record shows that at the time there were about forty residences and one filling station in the area, the homes being along the highway. The Trustees of the Village, fearing expansion in some form by one or more of their neighbors, decided that they wanted a "zoning ordinance" with the primary idea in mind that the entire territory should be maintained as a single-family residential district. Thereupon, the Trustees borrowed copies of some existing zoning ordinances, read them, and asked

an attorney "to submit to us a procedure"; thus, "we came to the conclusion that we wanted the entire village zoned residential, single family residential." No consultant was employed, no plans were developed as such, no reports received, and no study or plan of land uses was made. So far as shown, there was no zoning map prepared or filed until at least 1956 when, by ordinance, the Village adopted a "new and reformed map." A stipulation was made at the trial, however, "that there is no zoning map presently in existence." There is a necessary inference here that in 1960 or 1961 the Village was regularly reclassified as a city.

Ordinance No. 21 was obviously prepared from other Zoning Ordinances, but with radical changes. The preamble follows much of the wording of §§ 89.020 and 89.-030;[1] the ordinance placed "all of the territory of the Village" in a single district, namely, "District 'A', a Single Family Dwelling District," except as it might be amended thereafter. The district was further defined as permitting churches, public schools, farms, parks and certain institutions. The same zoning was also applied to all annexed territory unless thereafter changed by amendment. The ordinance contained sundry definitions, regulations concerning subdivisions, miscellaneous regulations, and administrative provisions. There is nothing in the record to indicate that, prior to the adoption of the ordinance, the Trustees appointed a "Zoning Commission" as required by § 89.070, or that the procedure therein indicated was followed, i. e., a preliminary report, hearings, and final report. The ordinance itself contains several references to a "Zoning Commission," and to the fact that certain matters should be submitted to it.

In this situation, defendants bought from a builder a nearly completed fifteen-room house in the Village about the end of January 1953; they moved in, together with Mrs. Heidbreder's mother and father, in February. The house was planned and built for occupancy by two families or as two units; one unit consisted of eleven rooms, the other of four. Each had its own living room, kitchen, and bath facilities. There were separate outside entrances. There was a door in the common wall between the units; this was generally kept unlocked while defendants and Mrs. Heidbreder's parents lived there. The building permit issued for this house was for a "single family dwelling," but "as described in Blue Prints attached to application * * *." Defendants bought the house without any inquiry concerning the zoning, did not see the building permit, and merely relied on the fact that the blueprints provided for two units. Defendants moved out in August 1960; from that time on the separate units were rented to different families. The larger one was ordinarily leased, the smaller one rented from month to month. A night latch was placed on the common door and the units were thereafter operated as wholly separate. In the fall of 1960 the neighbors began to complain to the City of the unkempt condition of the premises, of beer bottles scattered around, cars parked on the lawn at times, trash cans left outside, and other similar annoyances. One of these neighbors testified that there had been a total of thirteen different tenants in the property within the past year and a half, which Mr. Heidbreder denied. Supposedly the conditions had been remedied somewhat by the time of trial, but the neighbors who testified were completely dissatisfied with the fact of the multiple occupancy.

Defendants received letters from the City dated October 10, 1960, December 20, 1960, and January 27, 1961, complaining of their violation of the Zoning Ordinance, requesting compliance, and finally giving notice of impending legal action. This suit was instituted on March 20, 1961. Defendants

1. All statutory references are to RSMo 1949 and V.A.M.S., the revision in effect in 1950; however, there have been no changes since in the applicable sections.

filed a motion to dismiss which, among other things, raised the contention that the ordinance was invalid as a deprivation of defendants' property contrary to the appropriate due process clauses. This defense was later preserved in an answer, as were also such other defenses as we shall discuss.

It has been more or less assumed in this record that plaintiff has made some annexation of territory since 1950, but the details are not shown. In order to complete the factual picture we should note the following amendments of the original 1950 Zoning Ordinance: 7 July 1953, County Zoning was adopted for any annexed areas, unless changed; 7 February 1956, an ordinance adopted a "revised and reformed" zoning map, and zoned two specific lots to "local business" or "commercial" use; 3 April 1956, there was added to Ordinance No. 21 a new section creating a local business district, stating the uses permitted and setting out certain regulations; 3 April 1956, again adopts "revised" map, and rezones a tract 405 feet x 575 feet from single family residence to local business (this was apparently, in whole or in part, within the original Village); 7 Aug. 1956, established several different classifications for the ground area of single family residences, and also a "local business" district; 3 March 1959, adds "retail gasoline station" to permitted business uses; 2 June 1959, rezones a tract 100 x 283 feet to local business (this was rather clearly a part of the original Village); 2 Feb. 1960, rezones 12 lots to local business (apparently in an annexed area); 7 Mar. 1961, certain permitted business uses added.

Essentially, the points made by defendants-appellants are: that the restriction of the whole of Moline Acres to a single use district, namely, single-family residences, was so arbitrary and unreasonable as to be violative of the due process clauses of the Federal and State Constitutions; that the ordinance was not adopted pursuant to a "comprehensive" plan as required by Chapter 89, RSMo 1949, and that these statutes did not and do not authorize the adoption of such a plan; also, that the City's action is barred by laches and estoppel.

The City insists that it was incumbent upon defendants to prove that some part or parts of the territory were unsuited to residential uses and that they did not do so; that the plan adopted was "comprehensive," and that the creation of more than one use district is permissive under our statutes, but not mandatory; in short, that the ordinance as originally adopted was entirely valid. The City also asserts that the doctrines of laches and estoppel are not applicable. The contention concerning the failure to show any "unsuitability" goes primarily to the question of reasonableness as opposed to arbitrary action on the part of the Trustees; and this, in turn, bears on the constitutionality of the ordinance, for the "zoning power does not extend to unreasonable or arbitrary intermeddling with the private ownership of property." 58 Am.Jur., Zoning, § 21, p. 953. We shall not find it necessary to pass upon the constitutional question here, though incidental references will be made to certain cases in which the question was ruled.

■ We deem it unnecessary to recapitulate here the recognized principles which our courts follow in reviewing the validity of zoning ordinances. They are fully set out in the following cases: Downing v. City of Joplin, Mo., 312 S.W. 2d 81; City of St. Louis v. Friedman, 358 Mo. 681, 216 S.W.2d 475; City of Richmond Heights v. Richmond Heights Memorial Post Benevolent Ass'n, 358 Mo. 70, 213 S.W.2d 479; Schell v. Kansas City, Mo., 226 S.W.2d 718; State ex rel. Christopher v. Matthews, 362 Mo. 242, 240 S.W. 2d 934; Women's Kansas City St. Andrews Society v. Kansas City (C.A.8), 58 F.2d 593. The City insists, and properly so, that one attacking the reasonableness of a zoning ordinance has the burden of proving it unreasonable. Downing v. City of Jop-

lin, Mo., 312 S.W.2d 81. That point is, however, of no particular materiality in the view we take of the case.

■ There can be no doubt that our zoning enabling act, §§ 89.010 to 89.140, inclusive, constitutes the sole source of power and the measure of authority for cities, towns and villages in zoning matters. State ex rel. Nigro v. Kansas City, Banc, 325 Mo. 95, 27 S.W.2d 1030; State ex rel. Kramer v. Schwartz, 336 Mo. 932, 82 S.W. 2d 63; Wippler v. Hohn, 341 Mo. 780, 110 S.W.2d 409; State ex rel. Luechtefeld v. Arnold, Mo.App., 149 S.W.2d 384. As said in Kramer, supra, at 82 S.W.2d loc.cit. 66: "We think it clear upon elementary principles that the Enabling Act of 1925, properly interpreted, must be treated as the measure of the power of Jefferson City to pass a valid zoning ordinance. The Enabling Act is a grant of a portion of the state's police power, and the extent of the powers granted as well as the manner of their exercise must conform to the terms of the grant." We look thus to the wording, the context, and the real purpose and intent of our enabling statutes.

Section 89.020 provides that: "For the purpose of promoting health, safety, morals, or the general welfare of the community, the legislative body of all incorporated cities, towns and villages is hereby empowered to regulate and restrict the height, number of stories, and size of buildings and other structures, the percentage of lot that may be occupied, the size of yards, courts, and other open spaces, the density of population, and the location and use of buildings, structures and land for trade, industry, residence or other purposes."

Section 89.030 provides: "For any or all of said purposes the local legislative body may divide the municipality into districts of such number, shape, and area as may be deemed best suited to carry out the purposes of sections 89.010 to 89.140; and within such districts may regulate and restrict the erection, construction, reconstruction, alteration or use of buildings, structures, or land. All such regulations shall be uniform for each class or kind of buildings throughout each district, but the regulations in one district may differ from those in other districts. (R. S.1939, § 7413)"

Section 89.040 provides: "Such regulations shall be made in accordance with a comprehensive plan and designed to lessen congestion in the streets; to secure safety from fire, panic and other dangers; to promote health and the general welfare; to provide adequate light and air; to prevent the overcrowding of land; to avoid undue concentration of population; to facilitate the adequate provision of transportation, water, sewerage, schools, parks, and other public requirements. Such regulations shall be made with reasonable consideration, among other things, to the character of the district and its peculiar suitability for particular uses, and with a view to conserving the values of buildings and encouraging the most appropriate use of land throughout such municipality." References will be made incidentally to certain other sections as the occasion may arise.

■ The ordinary concept of "zoning" is to "mark off into zones * * * to partition * * * by ordinance into zones or sections reserved for different purposes * * *." Webster's Third New International Dictionary. Or, more technically, it is: "The division of a city by legislative regulation into districts and the prescription and application in each district of regulations having to do with structural and architectural designs of buildings and of regulations prescribing use to which buildings within designated districts may be put." Black's Law Dictionary, 4th Ed., citing cases. While the word "zoning" is not used as such in the sections just quoted, there are references in the Act generally to the *Zoning* Commission; and the title to the original Act (Laws 1925, p. 307 et seq.) included the phrase "to provide for the adoption of comprehensive zoning plans * * *." The Bench and Bar have very generally regard-

ed this Act as our *zoning law*, hence the applicability of the plain and ordinary meaning of the words "zone" or "zoning." In other words, a *"zoning,"* in its ordinary sense, does not mean the creation of *one* district or zone of a town, an area, or the world in general (as, for instance, we have Torrid, Temperate and Arctic Zones).

It is true that in Section 89.030 it is stated that the local legislative body *"may* divide the municipality into districts * * * as may be deemed best suited," and thus may regulate within each district. The City here insists that the word "may" simply leaves the matter to the City's discretion,—to create *one* district or more. We prefer not to treat this word as a thing separated from the aggregate of the statutory provisions. We do note, however, that the courts sometimes construe the word "may" as meaning "shall" when justice and good sense require. Section 89.040 specifically requires that all such regulations (i. e., the zoning) shall be made "in accordance with a comprehensive plan * * *," and the wording of the section clearly indicates an intent to require a consideration of *future conditions* as well as those presently existing. Section 89.070 requires the appointment of a "Zoning Commission" which *shall "recommend the boundaries of the various original districts"* (a rather foolish requirement if the only boundary is to be the existing city limits) together with appropriate regulations; this Commission shall also make a preliminary report, hold hearings, and make a final report, until which latter time the legislative body may not act. (Italics ours.)

In State v. Huntington, 145 Conn. 394, 143 A.2d 444, loc. cit. 446, the court said in part: " 'A comprehensive plan has been defined as a general plan to control and direct the use and development of property in a municipality or a large part thereof by dividing it into districts according to the present and potential use of the properties.' " And that court further said, in regard to the mere adoption of existing uses,

without defined zone boundaries, that such an attempt: " * * * ·without regard to considerations other than actual current uses, shows an utter lack of any plan for the orderly development of land uses in the town and renders the regulations pertaining to the uses in the purported districts meaningless. * * *"

An illustration of a "comprehensive plan" appears in the case of Downing v. City of Joplin, Mo., 312 S.W.2d 81, where, although the use sought to be extended was on a street zoned "D" for local business, the court saw fit to consider also the residential zoning of the surrounding areas in arriving at the basis of its decision. The court said, loc. cit. 85: "Viewing the restriction on respondents' property as a part of a comprehensive zoning plan, there can be no doubt of its validity."

The City insists: that a plan such as this may be "comprehensive" where it includes the entire town, even though it establishes only one use district; that there was no necessity for hiring consultants or for a lengthy study, and that the Trustees were entirely capable of making the determination that the entire Village was suited to one-family residences, and to act accordingly. It is true that § 89.040 permits the consideration of the "character of the district" and of its suitability for particular uses. We are of the view, however, that, considering these statutes as a whole, in context, and considering their aggregate purpose and intent, it was never intended thereby to give to a municipality the power to adopt a *one use district* zoning ordinance encompassing the whole town. We do not quibble about the absence of a consultant; we are dealing with a *lack of authority.* Even if the whole village was then suitable for one-family residences, we have the necessary inference that its suitability *in the future,* (in whole or in part) for other uses was not adequately considered. Our construction of the enabling act is supported, we feel, by the established fact that within

a few years the City found it necessary to begin rezoning or "spot zoning" substantial parts of the area to "local business," and that this included parts of the original Village, as well as annexed areas. We hardly need to say that a consideration *in advance* of the necessity for and the location of future business areas would be more fair and just to all concerned (including those who might build residences nearby) and certainly more in keeping with the intent of our statutes.

This, so far as we can find, is a matter of first impression in Missouri, and there are very few cases on the precise subject elsewhere. In Town of Hobart v. Collier, 3 Wis.2d 182, 87 N.W.2d 868, the court invalidated a single district residential zoning, largely on the ground of unreasonableness and consequent unconstitutionality. However, the decision was undoubtedly influenced by the fact that parts of the area were found to be unsuitable for residential purposes. There is much in the opinion, however, which is antagonistic to the concept of a single use zoning.

In Dowsey v. Village of Kensington, 257 N.Y. 221, 177 N.E. 427, 86 A.L.R. 642, where the court invalidated a zoning ordinance, it said in part, at 177 N.E. loc. cit. 430: "The village of Kensington is small in area, and the board of trustees have not attempted in the zoning ordinance to segregate in appropriate places within the village all the activities of communal life. They have relegated business and industry to a very small section which the evidence shows is not adapted to business, and have excluded from the main portion of the village even residences excepting one-family detached houses."

The case which is most often cited on this subject is Valley View Village v. Proffett (C.A.6), 221 F.2d 412. There the court declined to rule unconstitutional, as violative of due process, a village zoning ordinance fixing a one-use residential district for the entire town. The town was "sparse-ly settled." As we read the opinion, its primary ruling was on the question of constitutionality. However, the court did proceed to consider certain parts of the Ohio enabling statutes (similar in a general way to our own) and held that the ordinance constituted a sufficient compliance. In considering the words "may * divide" into districts, the court held that such a division, though mandatory upon the planning commission (due to somewhat different wording), was merely permissive as to the Village. Also, the court said there, in part, 221 F.2d loc. cit. 418: "Situations in which the legislative body of a municipality would even desire to put its entire area into but one use district are no doubt rare. Situations in which such an ordinance would withstand constitutional attack with respect to the impact upon particular property within the municipality are perhaps even rarer. We conclude only that, if otherwise permitted by the Constitution and statutes of the state, a one-use ordinance is not necessarily so arbitrary and unreasonable as in every case to be invalid." An inherent difference in that case and ours, however, lies in the great emphasis placed there upon the "Home Rule Provision" of the Ohio Constitution, art. 18, § 3 to which the enabling statutes were expressly made subject; that provision was as follows: " 'Municipalities shall have authority to exercise all powers of local self-government and to adopt and enforce within their limits such local police, sanitary and other similar regulations, as are not in conflict with general laws' " In view of the distinctions, the case is not overly persuasive here.

A case more or less in point, not cited by either party, is Connor v. Township of Chanhassen, 249 Minn. 205, 81 N.W.2d 789. It involved a single-use farm—residential zoning ordinance of a suburb of one of the metropolitan areas; the ordinance had been amended later to include business or industry. This ordinance was held valid in general as against constitutional objections, although invalid as to plaintiffs' par-

ticular desired use. The court also considered certain phases of the Minnesota enabling statutes, but it seems to have done so as applicable merely "In support of the contention that the ordinance as adopted is unconstitutional, * * *." (loc. cit. 795.) While that statement may seem unusual, we note that apparently the sole submitted issue was the question of constitutionality. In that light, the case is probably distinguishable.

■ In view of the paucity of authority generally, and the differences in constitutional provisions, statutory provisions, and issues determined in the few analogous cases, we are not persuaded here by the decisions in the Valley View and Connor cases. It is our duty to interpret and declare the purpose and intent of our own statutes, absent any necessary constitutional inhibition, and this we have sought to do.

■ We note also that the record does not show the appointment of a zoning commission or the receipt by the Trustees of reports from it before taking final action on the ordinance. Section 89.070. This, in itself, would ordinarily be fatal. State ex rel. Kramer v. Schwartz, 336 Mo. 932, 82 S.W.2d 63. We do not rest our ruling upon this point, due to the fact that the record may possibly be deficient; that, however, seems improbable in view of the testimony developed from the then Chairman of the Board of Trustees, outlining what was and was not done.

■ The Trustees of the Village of Moline Acres had no authority to adopt its Ordinance No. 21, and that Ordinance was and is invalid. It is unnecessary, of course, to rule upon any contention of laches or estoppel. The judgment is reversed, with directions to the trial court to enter its judgment in accordance with the views expressed in this opinion.

All of the Judges concur.