Genevieve S. McDERMOTT, Plaintiff-Respondent,

v.

VILLAGE OF CALVERTON PARK, Virgil Syberg, George Barbero, Arthur Quillo, Joseph Gordon, Charles Myles, Jean Poropat, Lowell Girardier, and C. S. Lafferty, Defendants-Appellants.

No. 55224.

Supreme Court of Missouri, En Banc.

May 11, 1970.

Arthur H. Slonim, Richard L. Ross, Slonim & Ross, Clayton, for plaintiff-respondent.

John J. Gerst, St. Louis, for defendants-appellants.

HOLMAN, Judge.

In this declaratory judgment action P. Joseph McDermott and Genevieve S. McDermott, his wife, sought to have the court declare invalid the general zoning ordinance of the Village of Calverton Park, St. Louis County. Plaintiffs were the owners, by the entirety, of a tract of land in the village. The individual defendants are members of the Board of Trustees and other officials of the village. After an extended trial the court found the ordinance "invalid as not meeting the requirements of Chapter 89, 'Zoning and Planning' of the Revised Statutes of Missouri." Defendants appealed to the St. Louis Court of Appeals. That court, acting under the compulsion of the case of City of Moline Acres v. Heidbreder, Mo.Sup., 367 S.W.2d 568, affirmed the judgment. The appeals court, however, indicated that it disagreed with our decision in Moline Acres and accordingly transferred the case to this court so that we could re-examine the existing law. It will be determined here "the same as on original appeal." Civil Rule 84.-05(h), V.A.M.R., and Mo.Const., Art. V, § 10, V.A.M.S. After the appeal was taken Mr. McDermott died and therefore Mrs. McDermott now appears as the sole plaintiff.

The question before us concerns the validity of Zoning Ordinance No. 77 enacted

by the village on January 15, 1953. It did not provide for any commercial use and, with certain exceptions not here material, limited the use of the land to one-family dwellings.

The lots in Calverton Park were platted about the year 1925. By the time the zoning ordinance was adopted, in 1953, single-family dwellings had been constructed on about 70% of the lots and there had been no commercial construction. Calverton Park is a relatively small village which, at the time of trial, had about 1,700 inhabitants. The village adjoins the City of Florissant on the north and east, and the City of Ferguson on the south. Prior to the adoption of Ordinance No. 77 a Planning and Zoning Commission was appointed and that Commission, after eight or ten meetings and the holding of a public hearing, made the report and recommendation to the Board of Trustees of the village which culminated in the adoption of the ordinance. The ordinance made provision for public buildings, parks and golf courses, but, as indicated, restricted other uses to one-family dwellings. It divided the city into four zoning districts. R1 consisted of a portion of the village which had been subdivided into small lots. R2 encompassed the lots fronting on Florissant Road and these lots were somewhat larger. R3 consisted of large tracts of from one to twelve acres upon which had been constructed a number of very fine homes. R4 was also made up of fairly sizeable tracts. The ordinance contained specifications regarding the minimum lot size, locations of buildings on the lots, and minimum standards of construction materials allowable in each of the zoning districts. The ordinance also contained a provision whereby the Board of Trustees was authorized, after public notice and hearings, to amend or change the regulations contained in the ordinance.

The McDermotts bought their residence which was located on two lots facing North Florissant in June 1946. Thereafter they purchased a number of adjoining vacant lots. They ultimately had a tract containing about two and one-half acres which had a frontage of 280 feet on Florissant, extending between Barto Drive and Connolly Drive and consisted of 19 lots. At that time North Florissant was a two-lane street without much traffic. They set out an orchard on the vacant lots and at one time kept about 300 chickens and a number of ponies. The lots fronting on Florissant are in R2 District and the remainder of the lots are in R1. As the years passed, Florissant Road became a major traffic artery leading to other communities and highways in the northwest part of St. Louis County. In 1958 it was widened to 80 feet and became a four-lane concrete highway. Parking was not permitted on Florissant, and, an electric traffic signal was installed in front of the McDermott property. In 1957 McCluer Senior High School was constructed in the City of Florissant on a tract of land fronting on the east side of North Florissant in the vicinity of the McDermott property. More than 3,400 students attend this school. A short time later a large school bus garage was constructed across from and a short distance south of the McDermott residence. At trial time 53 buses operated out of that garage. Most of them made two trips, both morning and evening, so that there were 180 bus trips a day from the school property. About 350 students cross Florissant going to and from the school each day. Mr. McDermott testified that because of the increased traffic and the resulting noise, fumes, and dirt, they desired to sell their property and listed it with a real estate agent five years before trial. He expressed the opinion that it was worth $60,000 if commercial use were permitted, but that he had been unable to obtain any offer for residential use. There was expert testimony that the property had a value of $66,500 for commercial purposes but that the house and two lots would not be worth more than $17,000 for residential purposes.

In January 1963 the McDermotts entered into a contract to sell their property for $58,500 to Larry Witzer with the provision therein that the sale was subject to the contingency that the seller obtain a rezoning of the property for commercial use (shopping center). The McDermotts accordingly made application for such rezoning. The Planning and Zoning Commission held a hearing thereon and on July 8, 1963, voted unanimously to recommend that the application be denied. The Board of Trustees thereafter denied the application.

On behalf of the McDermotts their real estate broker, in January 1964, filed an application for a building permit to build a shopping center on this land, which permit was denied by the Commissioner. This suit was filed shortly thereafter.

There was an abundance of evidence that ample commercial facilities existed to meet the needs of the residents of Calverton Park. The McDermott property is located almost on the northern boundary of the village. About one block north of that property is a shopping center, and a short distance beyond that is a larger shopping center. The southern boundary of the village is approximately one-half mile south of the property in question. There are commercial facilities on the east side of Florissant just south of the village boundary, and about a half mile beyond is the Duchesne Shopping Center which has almost every type of commercial facility. The main business district of Ferguson is to the south of that shopping center. .

There has been no change in the zoning ordinance since its adoption and hence Calverton Park is still used exclusively for one-family dwellings. One other property owner on North Florissant who testified in the case stated that he hoped, if rezoning were permitted, to sell his property for commercial use. Two real estate brokers testified on behalf of plaintiffs that the highest and best use for their property was commercial.

Defendants presented as a witness A. H. Dreyer, a city planner, who testified that he had made a study of Calverton Park and that in his opinion the village is properly zoned; that the village definitely has adequate commercial facilities available for the needs of the people in the surrounding area; that if he had been employed to zone the village he would not have done it materially different than was done in 1953; that to rezone plaintiffs' property for commercial use would be "spot zoning" and there is no commercial need for such; that if such rezoning occurred it would create a tremendous traffic generation and congestion and there would be more danger to school children crossing Florissant; that there are 90 residences in the village that front on Florissant, all of which are well maintained and desirable residence properties, and that if this shopping center should be constructed it would depreciate the value of residences located on Barto and Connolly Streets. On cross-examination he stated that he had been involved in planning 45 communities and that none of them had zoning which restricted use to one-family dwellings.

In our determination of the questions presented we must consider the following sections of our zoning statutes, V.A.M.S.[1]

"89.020. *Powers of municipal legislative body.*

"For the purpose of promoting health, safety, morals or the general welfare of the community, the legislative body of all cities, towns, and villages is hereby empowered to regulate and restrict the height, number of stories, and size of buildings and other structures, the percentage of lot that may be occupied, the size of yards, courts, and other open

1. We are quoting the sections as they exist today. Minor amendments to §§ 89.020 and 89.040 were made in 1959, but for our purposes they are the same now as in 1953 when Ordinance No. 77 was adopted.

spaces, the density of population, the preservation of features of historical significance, and the location and use of buildings, structures and land for trade, industry, residence or other purposes."

"89.030. *Zoning districts.*

"For any or all of said purposes the local legislative body may divide the municipality into districts of such number, shape, and area as may be deemed best suited to carry out the purposes of sections 89.010 to 89.140; and within such districts may regulate and restrict the erection, construction, reconstruction, alteration or use of buildings, structures, or land. All such regulations shall be uniform for each class or kind of buildings throughout each district, but the regulations in one district may differ from those in other districts."

"89.040. *Purpose of regulation.*

"Such regulations shall be made in accordance with a comprehensive plan and designed to lessen congestion in the streets; to secure safety from fire, panic and other dangers; to promote health and the general welfare; to provide adequate light and air; to prevent the overcrowding of land; to avoid undue concentration of population; to preserve features of historical significance; to facilitate the adequate provision of transportation, water, sewerage, schools, parks, and other public requirements. Such regulations shall be made with reasonable consideration, among other things, to the character of the district and its peculiar suitability for particular uses, and with a view to conserving the values of buildings and encouraging the most appropriate use of land throughout such municipality."

Our first task is to re-examine the case of City of Moline Acres v. Heidbreder, supra, in which a zoning ordinance that placed all of the village in one district zoned for single-family dwellings was held to be invalid. Defendants have devoted a substantial portion of their brief in pointing out factual distinctions between that case and the one before us, and contend that Moline Acres is not here applicable. While these cases have many distinguishing features we think Moline Acres, unless overruled, would control the decision in the case before us. This because Moline Acres held that our zoning statutes did not give to a municipality the power to adopt a one-use district zoning ordinance encompassing the whole town; that the village had no authority to adopt such a zoning ordinance. While Calverton Park had four districts, all were restricted to a single use, i.e., "one-family dwellings," and hence we consider the Moline Acres case to be applicable.

■ We have carefully re-examined Moline Acres and have concluded that it is not sound and should therefore no longer be followed. We have read and reread the applicable statutes and find nothing therein to indicate a legislative intent that, *under all circumstances,* a municipality must provide for more than one use in its zoning ordinance. We recognize that a comprehensive plan of zoning would, in most cities, particularly isolated ones, require commercial zoning districts in order for the needs of the residents to be conveniently supplied. However, St. Louis County, which completely surrounds (except for the portion fronting on the Mississippi River) the large City of St. Louis, is in a rather unique situation. Many people who work in St. Louis City live in the County. That fact, coupled with its own growth, has caused a vast number of cities and villages to be formed in the County, many of which are primarily for residential purposes rather than commercial or manufacturing. Those are often referred to as "bedroom" municipalities. Many of those cities are completely surrounded by other cities and most of the others border on one or more cities.

If one endeavored to formulate a hypothetical village where there would be no need for commercial facilities, and which

would be particularly suitable and desirable for one-family dwellings, he could do no better than describe Calverton Park. Improvements were constructed on almost 70% of the lots in Calverton Park during the 28 years prior to the adoption of the zoning ordinance. In that period no commercial facility was established in the village and each residence constructed was "one family." That situation demonstrates that the residents of Calverton Park, in 1953, were substantially unanimous in desiring the type of community the zoning ordinance provided for.

 The purpose for zoning is to promote health, safety, morals, and the general welfare. Section 89.020, supra. Certainly, where commercial and professional services are conveniently available elsewhere, none of those purposes would be enhanced by multiple-use zoning as compared to one-family dwelling use. Moreover, § 89.040 provides that the zoning should be "designed to lessen congestion in the streets; to secure safety from fire, panic and other dangers; to promote health and the general welfare; to provide adequate light and air; to prevent the overcrowding of land; to avoid undue concentration of population * * *." Under circumstances such as exist in Calverton Park all of those objectives are promoted by the one-family dwelling requirement and would be more likely to be accomplished than would be the case if there were multiple-use zoning. Furthermore, the "comprehensive plan" required by that section "shall be made with reasonable consideration, among other things, to the character of the district and its peculiar suitability for particular uses, and with a view to conserving the values of buildings and encouraging the most appropriate use of land throughout such municipality." Those requirements can be met by a one-use zoning ordinance such as we have in this case. We see nothing therein which would require multiple-use zoning.

As heretofore stated, we find nothing in any of the statutes which would preclude one-use zoning.

There do not appear to be many cases that have considered this question. The case of Valley View Village v. Proffett, 6th Cir., 221 F.2d 412, and Connor v. Township of Chanhassen, 249 Minn. 205, 81 N.W.2d 789, support our view. The contrary view is indicated in Dowsey v. Village of Kensington, 257 N.Y. 221, 177 N.E. 427, 86 A.L.R. 642, and Gunderson v. Village of Bingham Farms, 372 Mich. 352, 126 N.W.2d 715. The Gunderson case followed the Moline Acres case. While we regret that situation, we cannot permit it to restrain us from making what we consider to be a correct decision at this time.

As indicated, we rule that Ordinance No. 77 is not invalid as a matter of law.

 Plaintiff has also briefed the contention that "Zoning Ordinance No. 77 of the Village of Calverton Park is unreasonable, arbitrary, unduly restrictive, and bears no substantial relationship to public health, safety, moral or general welfare so as to infringe upon the rights of plaintiffs under the Fifth and Fourteenth Amendments to the Constitution of the United States and §§ 10 and 28 of Art. I of the Missouri Constitution, in that said ordinance restricts the use of plaintiffs' property to single dwelling, and such residential use of the property is unfeasible." In our consideration of this point we have in mind certain applicable rules, as follows: " 'Unless it should appear that the conclusion of the city's legislative body in the respect in issue here is clearly arbitrary and unreasonable, we cannot substitute our opinion for that of the city's Board of Aldermen in zoning the property in question, and establishing the boundary lines. If the city's action in zoning the property is reasonably doubtful or even fairly debatable we cannot do so.' * * * 'The governmental power to interfere by zoning regulations with the general rights of the land

owner by restricting the character of his use, is not unlimited, and, other questions aside, such restriction cannot be imposed if it does not bear a substantial relation to the public health, safety, morals, or general welfare.' * * * 'A zoning ordinance may be valid in its general aspects, and yet as to a particular state of facts involving a particular owner affected thereby may be as to such owner so clearly arbitrary and unreasonable as to be unenforceable.' * * * In ruling the issue of reasonableness each case must turn upon its own peculiar facts. * * * The fact that loss will be sustained through depreciation, if the ordinance is valid, is not controlling. Every valid exercise of the police power is apt to affect the property of some one adversely. State ex rel. Oliver Cadillac Co. v. Christopher, supra [317 Mo. 1179, 298 S.W. 720]; Geneva Inv. Co. v. City of St. Louis, supra [8 Cir., 87 F.2d 83]; Ryan v. City of Warrensburg, supra [342 Mo. 761, 117 S.W.2d 303]." Flora Realty & Investment Co. v. City of Ladue, 362 Mo. 1025, 246 S.W.2d 771, 777–779.

There is no contention that the ordinance was unreasonable when applied to plaintiff's property at the time it was adopted in 1953. Plaintiff and her husband became dissatisfied with their property for residential use about 1958 after Florissant had become a heavily traveled four-lane highway and the school garage had been constructed. We therefore construe plaintiff's contention to be that because of the changed conditions the ordinance had become unreasonable as to her property and hence the Village Board of Trustees acted arbitrarily in refusing to rezone it for commercial use.

There can be no doubt that the desired rezoning would not benefit any resident of the village except plaintiff. This for the reason that the services likely to be offered in the proposed shopping center are already available a short distance away. Plaintiff, of course, would be benefited because she would be able to sell her property for a great deal more for that purpose

than for residential. However, this is not a residential area substantially surrounded by commercial properties. There is a shopping center about a block to the north in the City of Florissant. For one and one-half miles to the south of that point, however, the west side of Florissant Road is completely residential. There is no commercial usage on the east side of Florissant for a distance of more than one-half mile to the south. While it must be conceded that the increase in traffic has made Florissant less desirable for residential use, Mr. Dreyer testified that there were 90 residences in the village that front on that street and that all of them are well maintained and are desirable residence properties.

There would be certain undesirable results if plaintiff's property were rezoned commercial. Mr. Dreyer stated that such would depreciate the value of residences located on both Barto and Connolly; that it would create tremendous traffic generation and that there would be more danger to school children crossing the street. He also stated that it would be spot zoning where there was no commercial need for such.

Section 89.040 states that zoning plans shall be designed to lessen congestion in the streets and to secure safety from various dangers. A rezoning in this instance would be contrary to those provisions as it would create more traffic and increase the danger to the school children. It has also been said that "[A]s a general rule, a municipality is without authority to single out one or a few lots in an amendatory regulation and arbitrarily remove therefrom restrictions imposed on the remaining portions of the same zoning district. Accordingly, a reclassification of only the lot or lots of a single person from a residential to a business, commercial, or industrial district, without lawful basis and without reference to the public welfare, is improper spot zoning. An application for such a change should be regarded with suspicion and should be denied unless the change re-

quested will conform to a comprehensive plan and serve one or more of the purposes enumerated in the zoning statute." 101 C. J.S. Zoning § 91, pp. 844, 845. See also Wippler v. Hohn, 341 Mo. 780, 110 S.W.2d 409[8]. As we have stated, the rezoning would greatly increase the value of plaintiff's property. While that fact is not controlling it is an element we should consider and, in reaching our decision, we have done so.

The question for our decision is whether the public interest and welfare is sufficient to outweigh the financial detriment to plaintiff. If the question is fairly debatable we cannot interfere and the ruling of the Board of Trustees must prevail.

We have concluded that, at the very least, the question is fairly debatable. It would appear to be contrary to the general welfare of the inhabitants to rezone this property for unnecessary commercial use in a village so obviously suitable for exclusive one-family dwellings. When we consider that no resident except plaintiff would receive a benefit, and that there would be the various detriments which we have heretofore outlined, it could hardly be said that the decision of the trustees was so arbitrary and unreasonable that it would infringe upon the rights of plaintiff under the various constitutional provisions mentioned.

In support of her contention plaintiff has relied solely on Huttig v. City of Richmond Heights, Mo.Sup., 372 S.W.2d 833. Therein we held that the maintenance of residential zoning on a vacant tract located on Clayton Road was so unreasonable and arbitrary that it infringed on the rights of the owners under the due process clauses of both the state and federal constitutions and was therefore invalid. That case, however, is so clearly distinguishable on the facts that it is not applicable here. We need not state the differences in detail. It is sufficient to say that in Huttig there was an extensive commercial development beginning at the west boundary of the tract and there was a large supermarket across the street. The property was obviously located in an area which was primarily commercial and was not suited for residential use.

As indicated, we rule this point contrary to plaintiff's contentions.

The judgment is reversed and the cause is remanded with directions to the trial court to enter a judgment in accordance with the views herein expressed.

HENLEY, C. J., FINCH, DONNELLY, SEILER, MORGAN, JJ., and HOGAN, Special Judge, concur.

BARDGETT, J., not participating because not a member of the Court when cause was submitted.