## Richmond

BENNETT T. MATTHEWS V. BOARD OF ZONING APPEALS
OF GREENE COUNTY

September 1, 1977.

Record No. 750854.

Present: All the Justices.

BENNETT T. MATTHEWS V. COUNTY OF GREENE AND
BOARD OF SUPERVISORS OF GREENE COUNTY

September 1, 1977.

Record No. 761116.

Present: All the Justices.

*Record No. 750854*

*C. Waverly Parker* for plaintiff in error.

*Edward R. Slaughter, Jr. (David C. Dickey, Commonwealth's Attorney; McGuire, Woods & Battle,* on brief), for defendant in error.

*Record No. 761116*

*C. Waverly Parker* for appellant.

*Edward R. Slaughter, Jr. (David C. Dickey, Commonwealth's Attorney; McGuire, Woods & Battle,* on brief), for appellee.

COCHRAN, J., delivered the opinion of the Court.

These appeals, separately briefed but consolidated for oral argument, present questions concerning the Interim Zoning Ordinance of Greene County. In the first proceeding (Record No. 750854), Bennett T. Matthews has appealed from the final order of the trial court entered on April 4, 1975, affirming on certiorari the denial by the Greene County Board of Zoning Appeals of his application for a special use permit under the Ordinance. In the second proceeding (Record No. 761116), in which Matthews sought a declaratory judgment ruling that the Ordinance was invalid either facially or as applied to his land, he has appealed from the final order entered in April 26, 1976, upholding the validity of the Ordinance.

## I. FACTS AND PROCEEDINGS

Greene County, a small rural county on and east of the eastern slope of the Blue Ridge Mountains, lies between Albemarle County on the south and Madison County on the north. The county seat is Stanardsville, an incorporated town with a population of less than 300. In 1970 the population of the entire county was 5,248. Of the total area of 153 square miles, 97% was in agricultural, forest or nonproductive uses in 1974. There was only one industrial use, a cabinet shop with two employees; there were 96 commercial establishments, of which 22 were vacant and 20 were structurally substandard; there were 2,624 dwellings, predominately single-family. Although there are no railroads in the county, two primary highways, U. S. Route 29, extending north and south, and U. S. Route 33, running east and west, intersect at the village of Ruckersville.

In the late nineteen sixties the decline in population which had long continued was reversed by the influx of permanent residents from Albemarle County, the City of Charlottesville, and metropolitan centers to the northeast. The number of part-time residents also increased as more vacation homes were established in the mountainous areas. During the decade ending in 1969 the county had lost 54.5% of its farms and 41.9% of its farmland. For the first time a subdivision ordinance was adopted in 1969 to provide a measure of control over land development. Between 1968 and 1973, 31 subdivision

developments were recorded, and two others were proposed. It was estimated that the 3,095 vacant lots in these subdivisions were more than enough to cause the population of the county to triple.

County officials requested assistance in 1970 from the Thomas Jefferson Planning District Commission, which recommended that a comprehensive plan be prepared, and this was undertaken. In 1973, consideration was given to the enactment of an interim zoning ordinance, and a rough draft, on which George B. Evans, Jr., a senior planner for the Commission, collaborated with another Commission planner, was submitted in July to the Board of Supervisors for review. Evans subsequently collaborated with the same planner in preparing a draft of the permanent zoning ordinance for the county.

Matthews acquired a tract of 111 acres near Ruckersville in November, 1973, in the dissolution of a corporation in which he owned stock. He proceeded with plans to develop this property as a subdivision to be known as Greentown Village, containing 180 lots for 348 housing units, including apartments. He incurred expenses of approximately $6,700, including $3,500 for a topographic survey, $1,500 for a preliminary plat, and $1,265.30 for a soil analysis. There was evidence, however, from which it could be inferred that only the cost of the preliminary plat was not recoverable.

On February 4, 1974, Matthews submitted his preliminary plat for approval under the county Subdivision Ordinance, but the plat was rejected because it showed townhouses which did not comply with the applicable setback requirements. On February 7, 1974, the Interim Zoning Ordinance was advertised. On February 26, 1974, Matthews's preliminary plat, revised to eliminate townhouses, was approved by Julius Morris, County Administrator, subdivision agent, building official, and zoning administrator for the county. On March 2, 1974, the Interim Zoning Ordinance was approved by the Board of Supervisors. No comprehensive plan for the county had been approved at that time.

The Interim Zoning Ordinance contained the following preamble:

WHEREAS, The County Planning Commission of the County of Greene is engaged in the preparation of a

long-range general plan to guide and facilitate orderly and beneficial growth in this county, and is engaged in the preparation of a comprehensive zoning ordinance to serve as a primary means for achieving such orderly and beneficial community; and,

WHEREAS, an interim ordinance is necessary in order to protect this county during the preparation of said general county plan and comprehensive zoning ordinance from any building construction and new uses of land that may do irreparable harm to the character of existing neighborhoods and which may defeat the purposes of the long-range general plan and comprehensive ordinance.

By its terms the Ordinance was "to remain in force and effect until the adoption of a comprehensive zoning ordinance, but not for longer than one (1) year." The entire unincorporated area of the county was zoned as one district designated as "Rural-Residential District" in which one dwelling unit per two acres was permitted. Accessory uses and structures, agriculture, churches, conservation and preservation areas, forestry, public facilities, public utilities, and single-family dwellings were permitted of right, and all other uses were authorized only by special use permit. A Board of Zoning Appeals was created with specified powers and duties, including that of hearing applications for special use permits.

Section 5.2-1 of the Ordinance required the Board of Zoning Appeals, in deciding whether to approve applications for special use permits, to consider certain factors. The use must not change the character and pattern of development of the area, and must be in harmony with uses permitted of right in the zoning district, and the location and height of buildings must not hinder or discourage the appropriate development and use of adjacent land and buildings.

Provision was also made for special permits in hardship cases. Under Section 5.3-1(d) a subdivider who, in good faith and prior to enactment of the Ordinance, had obtained preliminary approval of a subdivision under the provisions of the Subdivision Ordinance and was in compliance with applicable time limits required thereunder, was entitled, if the passage of the Ordinance "worked a financial hardship on him," to a rebuttable presumption in favor of the granting of a special use permit for his subdivision.

There was evidence that Morris informed Matthews, at the time the preliminary plat was approved, that the proposed Interim Zoning Ordinance could affect Matthew's subdivision, that Morris reminded Matthews that the final subdivision plat must be submitted within six months after approval of the preliminary plat, and that prior approval of the final plat by various State agencies must be obtained. Morris testified that he informed Matthews in April or May, 1974, that Matthews must procure a special exception under the Ordinance because the lots shown on his preliminary plat failed to meet the two-acre minimum requirement of the Ordinance.

When Matthews submitted his final plat, duly approved by the necessary State agencies, in August, 1974, within the time limit specified in the Subdivision Ordinance, it was rejected because it did not comply with the two-acre minimum lot requirement of the Interim Zoning Ordinance. Morris explained that the Subdivision Ordinance, which permitted lots of smaller size, had been superseded by the Interim Zoning Ordinance. He conceded that the Matthews plat complied with all provisions of the Subdivision Ordinance.

Matthews incurred additional expenses of $13,813.36 incident to the preparation of the final plat. He estimated the retail value of the subdivision, if he had been permitted to complete it, to be approximately $17,000,000.

Matthews applied for a special use permit under the provisions of the Interim Zoning Ordinance, and a public hearing was conducted by the Board of Zoning Appeals on September 25, 1974. The minutes of the Board show that various citizens spoke in opposition to the application, asserting that the proposed development would impose an undue burden on the public school system and other public services of the county and that no financial hardship had been shown by Matthews. The Board denied the application on the grounds that "no hardship financially" had been proved and that the proposed development was not compatible with the proposed Comprehensive Plan for the county. The Comprehensive Plan was adopted on November 16, 1974, after Matthews had filed a petition for certiorari to review the action of the Board of Zoning Appeals. A writ of certiorari was granted, and an evidentiary hearing was conducted by the trial court which, in a written opinion filed January 22, 1975, upheld the decision of the Board as not being

plainly wrong. Matthews's motion to set aside and revise the opinion and to consider the validity of the Interim Zoning Ordinance *sua sponte* was overruled by final order entered April 4, 1975.

On February 21, 1975, Matthews filed his bill for a declaratory judgment in the trial court challenging the validity of the Interim Zoning Ordinance (Record No. 761116). A plea in bar interposed on the ground that the proceeding was barred by the certiorari proceeding (Record No. 750854) was overruled by the trial court, and this ruling has been assigned as cross-error by the County and the Board of Supervisors.

The permanent Zoning Ordinance for Greene County, prepared by the Thomas Jefferson Planning District Commission, was duly adopted on February 22, 1975, effective March 1, 1975. It divided the unincorporated area of the county into eight districts as follows:

Conservation, C-1
Agricultural, A-1
Residential (Single Family Dwelling Units), R-1
Residential (Multiple Family Dwelling Units), R-2
Business (General), B-1
Business (Highway), B-2
Industrial, M-1
Flood Plain (General), FP

It is conceded that Matthews's proposed development does not comply with the provisions of the Ordinance, although lots as small as those projected by Matthews are permitted in other locations. Residential R-1 District has minimum lot sizes ranging from 10,000 to 30,000 square feet, and Residential R-2 District allows as many as eight multi-family dwelling units per acre. In the Conservation District the minimum size of lots is five acres, and in the Agricultural District two acres.

In the declaratory judgment proceeding extensive evidence was heard *ore tenus* by the trial court. Matthews adduced evidence purporting to show that Greene County had diverse characteristics which could not properly be encompassed in a single-district zoning ordinance. There was evidence that his proposed subdivision would adjoin an existing subdivision, Locust Lane, containing 55 lots of approximately one-half acre each, with single-family dwellings already built on 32 of the lots.

His expert planner, Rosser Payne, Jr., testified that in his opinion Matthews's location was suitable for a residential subdivision. Provision had been made for a sewage treatment plant, roads, water, and utilities, and the proposed development near the intersection of Routes 29 and 33 was in an area where a pattern of residential and commercial use had already been established.

The evidence for the county was that Matthews's development would change the character of the county and would locate an excessive number of residents in an area which good planning would reserve for agricultural or other low density use. Richard Yearwood, an expert planner called as a witness for the county, testified that in his opinion the Interim Zoning Ordinance was reasonable, because the homogeneity and lack of diversity in the county made it unnecessary to have multiple zones. He felt that the two-acre minimum lot size was not exclusionary or discriminatory because there were 2,056 platted lots of less than two acres each at the time the Ordinance was adopted. He testified that the Interim Zoning Ordinance "would be perfectly suitable" as a permanent zoning ordinance, "given the level of development and the nature of the county." In his opinion there was no difference between the interim zoning and the permanent zoning except that the locations of existing businesses were not shown on the map attached to the Interim Zoning Ordinance. He favored the flexibility of a single zone with all other uses made subject to special use permits.

The Comprehensive Plan projected primary population "clusters" in and around Standardsville, the county seat, and Corner Store, a community near the Albemarle County line. The Plan proposed to limit the population of the Ruckersville community to 500, in order to avoid traffic congestion and strip development along the major highways, and to encourage population growth in the two primary clusters. Matthews's land was not in a primary cluster.

At the time the Interim Zoning Ordinance was enacted prior adoption of a land use plan was not required.[1] Nevertheless, the

---

[1]Code § 15.1-490 (Repl. Vol. 1973) provided as follows:

"Zoning ordinances and districts shall be drawn with reasonable consideration for the existing use and character of property, the suitability of property for various uses, the trends of growth or change, the current and future requirements of the community as to land for various purposes as determined by population and economic studies and other studies, the transportation requirements of the community, and

Ordinance was prepared to a large extent on the basis of a land use survey made by Evans in late 1973 and subsequently incorporated into the Comprehensive Plan.

Evans testified, in answer to an inquiry by the trial court, that the Interim Zoning Ordinance, establishing one zone reflecting the basic characteristics of the county, served "not to freeze the growth in the county, but to allow new growth . . . in harmony with what exists . . . so that the plan could proceed and designate areas of growth so the permanent ordinance could reflect this." He justified the Ordinance because of the "tremendous" amount of development activity in the county and the necessity for exercising some control over development or, as he characterized it, "control of growth," pending completion of a comprehensive plan and a permanent zoning ordinance.

Robert E. Abbott, Jr., Director of the Thomas Jefferson Planning District Commission testified, without amplification, over Matthews's objection, that the factors set forth in Code § 15.1-490 had been considered in drafting the Interim Zoning Ordinance.

Morris testified that during the period November 1, 1973, to March 1, 1974, seven subdivisions, including that of Matthews, were proposed, and all but Matthews's were approved. During the year the Interim Zoning Ordinance was in effect, according to Morris, special use permits were granted by the Board of Zoning Appeals for several subdivisions that contained lots smaller than two acres in size. Several subdivisions, located in clusters as shown on the Comprehensive Plan, were approved with lots averaging 20,000 square feet in area. One, outside a cluster, was approved with average lot size of 1.9 acre. Another was approved with average lot size of 1.5 acre. One subdivision, comprising 96 lots averaging 20,000 square feet, was disapproved because of the lot size and its location "outside of the proposed cluster."

---

the requirements for schools, parks, playgrounds, recreation areas, and other public services; for the conservation of natural resources; and preservation of flood planes [plains] and for the conservation of properties and their values and the encouragement of the most appropriate use of land throughout the county or municipality."

Effective July 1, 1974, this statute was amended to require consideration also of "the existing land use plan." Acts 1974, c. 526.

## II. VALIDITY OF THE INTERIM ZONING ORDINANCE

The authority of the county to enact a zoning ordinance is found in Code §§ 15.1-486 [2] through 15.1-498 (Repl. Vol. 1973.) There is no special statutory provision for interim zoning ordinances.

■ Matthews, relying on our decision in *Bd. of Supervisors* v. *Horne*, 216 Va. 113, 215 S.E.2d 453 (1975), contends that without express statutory authority to enact an interim zoning ordinance, such an ordinance is void. But *Horne* is not controlling in the present case. In *Horne* we held that in the absence of express or implied authority under the enabling subdivision or zoning statutes an ordinance imposing a temporary moratorium on the filing of site plans and preliminary subdivision plats pending completion of a new comprehensive plan and zoning ordinance was void. In the present case, the Ordinance did not temporarily prohibit all new subdivision development in the county by suspending the operation of applicable ordinances; it merely purported to zone Greene County for a period not exceeding one year.

In the absence of specific authority for interim zoning, all zoning ordinances, however titled, are subject to the same statutory requirements. The temporary duration of the Ordinance under consideration is irrelevant, and the Ordinance must stand or fall as a valid or invalid zoning ordinance. *See Kline* v. *Harrisburg*, 362 Pa. 438, 68 A.2d 182 (1949); *State ex rel.*

---

[2]"**§ 15.1-486. Zoning ordinances generally; jurisdiction of counties and municipalities respectively.** — The governing body of any county or municipality may, by ordinance, divide the territory under its jurisdiction or any substantial portion thereof into districts of such number, shape and area as it may deem best suited to carry out the purposes of this article, and in each district it may regulate, restrict, permit, prohibit, and determine the following:

"(a) The use of land, buildings, structures and other premises for agricultural, commercial, industrial, residential, flood plane [plain] and other specific uses;

"(b) The size, height, area, bulk, location, erection, construction, reconstruction, alteration, repair, maintenance, razing, or removal of structures;

"(c) The areas and dimensions of land, water, and air space to be occupied by buildings, structures and uses, and of courts, yards, and other open spaces to be left unoccupied by uses and structures, including variations in the sizes of lots based on whether a public or community water supply or sewer system is available and used;

"(d) The excavation or mining of soil or other natural resources; and

"(e) Sedimentation and soil erosion from nonagricultural lands.

"For the purpose of zoning, the governing body of a county shall have jurisdiction over all the unincorporated territory in the county, and the governing body of a municipality shall have jurisdiction over the incorporated area of the municipality."

*Kramer* v. *Schwartz,* 336 Mo. 932, 82 S.W.2d 63 (1935); *Downey* v. *Sioux City,* 208 Iowa 1273, 227 N.W. 125 (1929); *Phillips Petroleum Company* v. *City of Park Ridge,* 16 Ill. App. 2d 555, 149 N.E.2d 344 (1958); *Morris* v. *Roseman,* 162 Ohio St. 447, 123 N.E.2d 419 (1954). Although the Interim Zoning Ordinance, like the Interim Development Ordinance in *Horne,* was designed as a temporary expedient to control growth in the county until a better ordinance could be prepared, this purpose does not of itself invalidate the Ordinance. Any zoning ordinance may be said to be temporary in the sense that it is always subject to amendment.

The critical question is whether the Board of Supervisors of Greene County acted arbitrarily and capriciously in enacting this single-district ordinance which permitted of right only minimum lot sizes of two acres throughout the county. The validity of single-district zoning ordinances enacted by municipalities has been considered in some jurisdictions with varying results. *See* Annot., 54 A.L.R.3d 1282. We are aware of no case, however, in which such an ordinance adopted by a county was considered. In *Town of Hobart* v. *Collier,* 3 Wis. 2d 182, 87 N.W.2d 868 (1958), a one-district zoning ordinance for a town of 180 square miles, an area greater than Greene County, was held to be unreasonable and arbitrary on its face because the ordinance failed to implement the purposes stated in its preamble of creating districts for trade, industry, residence or other uses.

Code § 15.1-486 authorizes a locality to divide "the territory under its jurisdiction . . . into districts of such number . . ." as it may deem advisable. A reasonable inference from this language is that there was a legislative intent that there be a division into two or more districts, rather than one or more districts. In so construing similar language the Michigan Supreme Court held invalid an ordinance which zoned an entire village in a single district. *Gundersen* v. *Village of Bingham Farms,* 372 Mich. 352, 126 N.W.2d 715 (1964). However, a Missouri case to the same effect, *City of Moline Acres* v. *Heidbreder,* 367 S.W.2d 568 (Mo. 1963), cited with approval in *Gundersen,* was overruled by *McDermott* v. *Village of Calverton Park,* 454 S.W.2d 577 (Mo. 1970), which held that a statute containing language similar to ours did not indicate a legislative intent that, under a circumstances, a municipality must provide for more than one

zoning district. The court considered the evidence which showed that there was no commercial construction in the village, that the village adjoined two cities, and that there were ample commercial facilities for its 1,700 inhabitants, and upheld an ordinance creating one single-family residential district for the entire village.

We find it unnecessary to decide whether Code § 15.1-486 precludes the enactment by any county or municipality under any circumstances of a single-district zoning ordinance. In addition to *McDermott*, cases from other jurisdictions which have considered such ordinances have ruled that their validity should be determined on the basis of the evidence. Thus, in *Valley View Village* v. *Proffett*, 221 F.2d 412 (6th Cir. 1955), where a zoning ordinance placed a residential village of 1,000 inhabitants, 18 square miles in area on the periphery of the City of Cleveland, in one residential zone, it was held that the ordinance was not per se arbitrary and unreasonable in its application. In *Town of Lebanon* v. *Woods*, 153 Conn. 182, 215 A.2d 112 (1965), an interim zoning ordinance placed the entire town, a residential community containing 750 dwellings and nine small commercial or mercantile establishments, in a residential zone with minimum lot sizes of one acre. The ordinance, adopted with reference to a comprehensive plan, was held to be valid. An ordinance zoning a town of 19.9 square miles and 6,700 inhabitants as a residential and farming district was upheld in *Cadoux* v. *Planning and Zoning Com'n of Town of Weston*, 162 Conn. 425, 294 A.2d 582 (1972). The court held that the reasonableness of the one-zone ordinance was a matter of fact, and that it was not arbitrary and unreasonable for a town on the periphery of larger metropolitan centers to preserve its residential character so long as the business and industrial needs of its inhabitants were supplied by accessible areas. *See also Blank* v. *Town of Lake Clarke Shores*, 161 So.2d 683 (Fla. App. 1964). In *Dowsey* v. *Village of Kensington*, 257 N.Y. 221, 177 N.E. 427 (1931), an ordinance which placed an entire village except for a small part thereof in one residential zone was held to be invalid. The court found that the ordinance did not attempt to segregate in appropriate places all the activities of commercial life and that the small area to which business and industry were regulated was not suitable for that purpose. Accordingly, we consider the Interim Zoning Ordinance in the light of the evidence in the record before us.

■ A zoning ordinance is presumed to be valid, the one attacking the ordinance must carry the burden of proof, and if the reasonableness of the ordinance is fairly debatable it must be sustained. *Board of Supervisors* v. *Carper*, 200 Va. 653, 660, 107 S.E.2d 390, 395 (1959). In that case, a zoning ordinance requiring minimum lot sizes of two acres in the western two-thirds of Fairfax County was held to be arbitrary and unreasonable, where by amendment developers were permitted for a period of two years to record plats providing for lots of a minimum size of one-half acre. It was conceded by the landowners that the two-acre minimum restriction was not per se invalid.

In the present case, the appellees, fortified by the ruling of the trial court sustaining the validity of the Ordinance, are entitled to have the evidence considered in the light most favorable to them. There was evidence that Greene County is a rural, homogeneous political subdivision. We cannot say that the trial court erred in finding that the factors set forth in Code § 15.1-490 were considered before adoption of the Interim Zoning Ordinance, although the evidence supporting this finding is weak. Nor can we say that the standards prescribed for the Board of Zoning Appeals in considering the issuance of special use permits provided insufficient guidelines as a matter of law. But the difference between this ordinance of limited duration and the permanent Zoning Ordinance, adopted after extensive and careful study, illustrates the arbitrary and capricious nature of the Interim Zoning Ordinance.

■ The permanent Zoning Ordinance created eight districts in lieu of the single district of the Interim Zoning Ordinance; the eight districts permitted lot sizes varying from no minimum area requirement other than that mandated for setbacks in certain districts to five acres in another district; and three districts provided for commercial and industrial development. Under the Interim Zoning Ordinance, however, all commercial and industrial uses became non-conforming uses and there was no provision of right for future non-residential development. The basic characteristics of Greene County did not change appreciably, if at all, during the twelve months that the Interim Zoning Ordinance was in effect. Hence, the conclusion is inescapable that if eight zoning districts were required in March, 1975, a single district was not adequate in March, 1974.

We can understand the preference of the county's expert witness for a low-density one-district ordinance with all other uses conditioned on the issuance of special use permits. From the planning point of view such a requirement would indeed provide maximum flexibility for the political subdivision. At the same time it would create maximum doubt and uncertainty for a landowner faced with the necessity of obtaining a special use permit over vocal opposition. We hold that the enactment of a one-district zoning ordinance permitting of right only lots of two acres or more in Greene County was arbitrary, unreasonable, and invalid.

## III. EFFECT OF THE PERMANENT ZONING ORDINANCE

■ The question arises whether Matthews should be subject to the provisions of the Permanent Zoning Ordinance which became effective March 1, 1975. In *Bd. Sup. James City County* v. *Rowe,* 216 Va. 128, 216 S.E.2d 199 (1975), we invalidated a zoning ordinance but directed the trial court on remand to give the local governing body adequate time to enact a new zoning ordinance. But in that case the invalid zoning ordinance had repealed a valid zoning classification so that the effect of the invalidation of the ordinance was to leave the land unzoned. *See also Richmond* v. *Randall,* 215 Va. 506, 211 S.E.2d 56 (1975); *Bd. of Supervisors of Fairfax County* v. *Allman,* 215 Va. 434, 211 S.E.2d 48 (1975).

In the present case, however, the land was unzoned at the time the Interim Zoning Ordinance was enacted, so the effect of invalidating the Ordinance is to leave the land classified as it was before. In *Carper* and *Horne,* where we also invalidated zoning ordinances, we did not grant time for additional local legislation. Moreover, it is uncontradicted that Matthews's final plat would have been approved in August or September, 1974, except for the Interim Zoning Ordinance. Under these circumstances we hold that the rule applied in *Rowe* is not applicable in this case and that Matthews's proposed subdivision is not subject to the provisions of the Permanent Zoning Ordinance.

## IV. CROSS-ERROR

■ There is no merit to appellee's contention that Matthews was barred by the adjudication in the certiorari proceeding (Record No. 750854) from challenging the validity of the Interim Zoning Ordinance in the declaratory judgment proceeding (Record No. 761116). Different issues were involved in the two cases. Matthews sought a special use permit under the Ordinance in the certiorari proceeding, but sought to have the Ordinance declared invalid in the other proceeding. *See Ribeiro* v. *Town of Andover,* 19 Conn. Sup. 438, 116 A.2d 769 (1955); *Nelson* v. *Town of Belmont,* 274 Mass. 35, 174 N.E. 320 (1931); Annot., 71 A.L.R.2d 1362, 1363. We have recently held that when a landowner contests the validity of a zoning ordinance as applied to his property he must first exhaust his administrative remedies before proceeding by declaratory judgment to attack the applied constitutionality of the ordinance. *Gayton Triangle* v. *Henrico County,* 216 Va. 764, 766, 222 S.E.2d 570, 572 (1976). This was the procedure followed by Matthews, except that he took the additional step of appealing to the trial court from the denial by the Board of Zoning Appeals of his application for relief. Even if the facial or applied constitutionality of the Ordinance could have been determined in the certiorari proceeding, a question which we do not here decide, this issue could properly be made the subject of a separate suit. *See Carter* v. *Hinkle,* 189 Va. 1, 52 S.E.2d 135 (1949).

## V. CONCLUSION

Our conclusion that the Interim Zoning Ordinance is invalid disposes of Matthews's appeal in the certiorari proceeding (Record No. 750854) which was based on the assumption that the Ordinance was valid, and we will dismiss that appeal.

For the reasons assigned, we will reverse the judgment order of the trial court in the declaratory judgment proceeding (Record No. 761116) and enter final judgment for Matthews.

*Record No. 750854 dismissed;*
*Record No. 761116 reversed*
*and final judgment.*