SNAKE RIVER VENTURE, a limited partnership, Appellant (Plaintiff),

v.

BOARD OF COUNTY COMMISSIONERS, TETON COUNTY, Wyoming, Appellee (Defendant).

No. 5222.

Supreme Court of Wyoming.

Aug. 21, 1980.

Rehearing Denied Sept. 24, 1980.

Michael J. Sullivan, of Brown, Drew, Apostolos, Massey & Sullivan, and William T. Schwartz, Casper, for appellant.

Henry C. Phibbs, II, Jackson, for appellee.

Before RAPER, C. J., and McCLINTOCK, THOMAS, ROSE and ROONEY, JJ.

ROSE, Justice.

This is a zoning controversy with a tortured procedural development. We will affirm the trial court, which held that the Board of County Commissioners (hereinafter Board) unlawfully gave final approval to a project, which, when initially approved, was probably in conformity with county regulations but was in non-conformity with amended regulations at the time the Board gave its final approval. The fact that the appellant-developer had not begun any actual construction on the project at the time of the trial court's decision is highly significant to our disposition of this appeal.

## THE FACTS

This case comes to us upon a set of stipulated facts, which we will reproduce in the abridged form indicated immediately below. It may, however, first be helpful for us to provide a simplified overview.

Appellant, Snake River Venture, is a limited partnership seeking to construct a subdivision and commercial development in Teton County. It applied to appellee, Board of County Commissioners of Teton County, for permission to do so. At first, the Board denied the application because it felt that the plan failed to conform to Board regulations. The Board was subsequently advised by its counsel that the regulations were not legally effective, whereupon initial approval was given to the subdivision plan. The Board then amended the county zoning regulations to make them more specific and in so doing followed the proper procedure to make the amended regulations effective. Thereafter, the Board completed its approval of appellant's project by issuing a planning certificate and approving the final plat.

Subsequently, in May, 1974, various county residents filed a declaratory-judgment action against the appellee-Board asking the court to declare that the Board had granted approval for the subdivision in violation of its regulations and that the authority for the development be rendered of no force and effect. Snake River was not a party to this action and the trial judge awarded judgment generally in favor of the county residents.

In 1976, appellant-Snake River filed a declaratory-judgment action alleging the prior judgment to be a cloud on its title and thus a deterrent to its right to develop its project. Snake River asked that the earlier judgment be declared to have no effect with respect to it and for a determination of the validity of the plat for its proposed development, which had been approved by the appellee. To this petition for declaratory judgment, the Board took the position, in its answer and counterclaim, that its approval of the development project had originally been illegal. The district court awarded judgment in favor of appellee-Board and Snake River has appealed.

The above-mentioned stipulation of facts is as follows:

"1. Plaintiff is a limited partnership which is the owner of lands in Teton County, Wyoming, more fully described as follows:

[Lands described here]

"2. Defendant is the Board of County Commissioners of Teton County, Wyoming.

"3. On or about December 6, 1972 the plaintiff partnership was formed for the purpose of acquiring and developing subject lands for condominium, apartment, townhouse and commercial purposes in accordance with plans and specifications earlier prepared. The property was acquired at a price of $225,044.44. Plaintiff expended the sum of $56,422.74 in formulating a development plan for the property and in securing planning, environmental and economic feasibility studies up to the date of approval of the subdivision plat by the County Commissioners.

"4. On August 1, 1967 the Board of County Commissioners for Teton County, adopted a resolution relating to the approval of subdivision plats, pursuant to the authority of §§ 34–12–101–115, Wyoming Statutes, 1977 [§§ 34–112 to 34–115, 34–117 to 34–126, W.S.1957] . . .

"5. Pursuant to and in conformity with the procedural provisions of §§ 289.-1–289.9, Wyoming Statutes, 1957 (now §§ 18–5–201—18–5–207, Wyoming Statutes, 1977), on the 19th day of November, 1970 the Defendant, Board of County Commissioners for Teton County approved a master plan entitled 'Master Plan for Teton County' . . . Pursuant to and in conformity with the procedural provisions of §§ 18–289.1–289.9, Wyoming Statutes 1957, (now §§ 18–5–201—18–5–207, Wyoming Statutes, 1977), on the 3rd day of October, 1972 the Defendant, Board of County Commissioners, adopted a Subdivision Resolution for the regulation of subdivision applications and development in Teton County, . . .

The resolution was to become effective January 1, 1973.

"6.   During January, 1973, pursuant to the subdivision resolution, plaintiff filed an application for permit to subdivide and develop the premises (50.7 acres) above described proposing to develop 550 residential units and a commercial frontage area.   The proposed subdivision is within the unincorporated area of Teton County and the plans provided for a central water and sewer system to serve the entire subdivision.   The application was filed with the Teton County Planning Commission.

"7.   After preliminary discussions the Planning Commission, at a hearing held February 28, 1973, took the matter under advisement and by letter dated April 18, 1973 rejected the plat and offered to consider a revised proposal,   .   .   .

"8.   Plaintiff submitted a modified plat and proposal in June of 1973, having reduced the density to 350 units and retaining the commercial area.   An environmental impact study was also submitted along with other materials .   . The application and the plat were considered by the Planning Commission at the June 8, 1973 meeting and additional information as to sewerage facilities and environmental matters were requested by the Planning Commission at its June 20, 1973 meeting, a report submitted on behalf of plaintiff was considered and reviewed at the July 18, 1973 meeting of the Planning Commission and the project was again considered at the August 15 meeting and a special meeting was set for September 5, 1973.

"9.   At a hearing held September 5, 1973 the Planning Commission voted to recommend disapproval of the new application relating their conclusions of September 5 hearing in their recommendations to the County Commissioners .   .

"10.   A joint meeting of the Board of County Commissioners and the Planning Commission was held on October 17, 1973 to review and consider the recommendations of the Planning Commission .   .

The joint meeting was adjourned without any action being taken and the Commissioners requested an opinion of the County Attorney relating to the applicability of the Master Plan in approving or denying subdivision applications.

"11.   Following receipt of an opinion .   .   .   from the County Attorney, Robert Ranck, the meeting of the Commissioners was reconvened on October 18, 1973 and having received, considered and following the advice of the County Attorney, the Commissioners approved plaintiff's project,   .   .   .   subject to plaintiff providing the Planning Commission with certain additional information.

"12.   On March 15, 1974, after receiving a request from a citizen's [sic] group calling themselves 'Friends of Jackson Hole,' the Board of County Commissioners refused to reconsider their decision of October 18, 1973, to approve the plaintiff's subdivision plat and proposed development .   .   .

"13.   Thereafter and following additional submittals by plaintiff regarding sewer and water systems to the Planning Commission and the defendant Board, the County Commissioners on April 3, 1974, issued a Planning Certificate .   .   . authorizing commencement of development upon approval of a final plat.   On July 2, 1974 defendant Board approved the final plat of the subdivision entitled 'Teton Rendezvous.'   .   .   .   The plat was filed and recorded in the records of Teton County, Wyoming on July 2, 1974 in Book 1 of Maps at page 9.

"14.   At a meeting of the County Commissioners held December 11, 1973, the Commissioners amended the 1972 Subdivision Resolution, incorporating a density requirement of one residence for each three acres and revising certain procedural provisions, and readopted the Resolution .   .   .   The Subdivision Resolution, as amended, was filed with the Secretary of State on February 1, 1974.   Prior to this filing the previous Resolution, [sic] had not been filed with the Secretary of State, nor had notice of that Subdivi-

sion Resolution been mailed to the Wyoming Attorney General's office prior to its adoption, through an omission of which the County Commissioners were unaware.

"15. On May 13, 1974 certain third-party residents of Teton County commenced a civil action in Teton County District Court (Civil 3011) against defendant Board wherein plaintiffs sought to have the Court declare subdivision permits acted on by the Board to have been improperly issued. Plaintiff herein, Snake River Venture, though having knowledge of the litigation, was not joined as party and did not seek joinder . . . A Judgment favorable to the Teton County residents who were plaintiffs was entered by the Court on November 12, 1974.

"16. Teton County, in administering its Master Plan and Subdivision Regulations from and after January 1, 1973, up to and until the adoption of the current Teton County Comprehensive Plan and Implementation Program on January 1, 1978, approved the following applications to subdivide land in the unincorporated areas of the County:

[The stipulation contains a lengthy list of subdivision applications, almost all of which have a density of less than one lot per acre. Appellant's application has the greatest density of any in the list.]

"No highway commercial development was approved in any of the above subdivisions adjacent to a public highway between January 1, 1973 and January 1, 1978 with the exception of Plaintiff's application and no formal applications were made for a commercial area bordering on a public highway during such period except Plaintiff's and the Letellier application approved with Plaintiff's and later rejected.

"17. Plaintiff filed this civil action on December 6, 1976, seeking a determination of the validity of the subdivision plat and permit approved by the Defendant Board of County Commissioners.

"18. The Board of County Commissioners has, since the filing of this litigation, adopted a Comprehensive Plan, effective January 1, 1978, which superseded the early Master Plan and subdivision Resolution.

"19. Plaintiff has undertaken no physical development of the property." (Bracketed matter supplied.)

*The Issues*

Initially, appellant-Snake River argues that the 1974 declaratory judgment was void because it was a necessary but unnamed party and therefore the district court was without jurisdiction to hear the case. The declaratory-judgment action filed by the appellant sought to collaterally attack this earlier declaratory judgment. We construe Snake River's first argument as an appeal from the refusal of the district court to rule favorably on this collateral attack.

Appellant's second argument is that the district court was without jurisdiction to consider appellee's counterclaim in the later declaratory-judgment action.

Finally, appellant argues that its subdivision plat was legally approved by the appellee-Board and, therefore, the district court was wrong in the later declaratory judgment when it arrived at a contrary conclusion.

The appellee-Board does not argue that the 1974 Declaratory Judgment should be binding on the appellant, but does take issue with appellant's other contentions.

As we perceive the totality of this appeal, Snake River seeks to render void or ineffective the two declaratory judgments discussed above. Such a result would leave Snake River with valid authority to start its project. We view the main issue in this case to be whether the appellee acted unlawfully in approving the project. This issue is closely related, but distinct from, the question of whether the appellee could lawfully have refused to approve a certificate and final plat for the proposed development.

## DISCUSSION

### Appellee's Counterclaim

In urging that the district court is without jurisdiction to consider the appellee-Board's counterclaim, the theme of which is that its own decision is illegal, Snake River says that the declaratory-judgment route is not the way appellee should appeal its own decision, and, in any case, an agency such as a board of county commissioners may not appeal its own decision.

These arguments are irrelevant because we consider appellee's counterclaim to be surplusage and unnecessary to our decision here. Appellant's declaratory-judgment complaint squarely placed before the district court the issue of the validity of appellee's approval of appellant's subdivision plat. Appellant's complaint contains this language:

"WHEREFORE . . . plaintiff [appellant] prays that the Court determine and declare the validity and effectiveness of its Final Plat in order that plaintiff may proceed with development of its property free of the cloud. . . ."

See, also, paragraph 17 of the stipulated facts. Since the question of the validity of the final plat was properly before the district court in the second declaratory-judgment action and was resolved in the negative—a result we will affirm—there is no need for us to evaluate the procedural correctness of the first declaratory judgment.

### Was the Appellee's Approval of Appellant's Subdivision Plat Binding on Appellee or Was it an Illegal Act Which was Void?

As we have mentioned, the appellee-Board undertook three separate steps in approving appellant's project. They were: Initial approval, issuance of the certificate, and approval of the final plat. We seriously doubt that any validly promulgated zoning ordinances specific enough to be enforceable were in conflict with the proposed development at the time that appellee gave its initial approval. However, this issue need not be reached since a density requirement of no more than three residences per acre became effective [1] prior to the last two approval steps of the appellee. (See paragraph 14 of the stipulated facts. Furthermore, appellant's brief does not quarrel with the validity of the December 11, 1973, amendment. Nonetheless, the dissent does dispute the validity of the amendment. We will respond to the dissent's argument separately.) From paragraphs 6 and 8 of the stipulated facts, it can be seen that appellant's modified proposed development was in conflict with the new density requirement.

We will assume, arguendo, that appellee's initial approval of the project was lawful and valid. Even so, we are led to the conclusion that appellee's final approval of the project was unlawful.

Appellant directs attention to § 18–289.9, W.S.1957, 1975 Cum.Supp. [now § 18–5–207, W.S.1977], which says that a zoning resolution shall not prohibit the continuance of the use of any land, building or structure for the purpose for which it is used at the time the resolution takes effect. From this, the appellant argues that "the use of the land had already been determined" by the appellee's initial approval of the project. However, we do not equate the word "use" in the statute with the above-quoted clause from appellant's brief. (It is stipulated that no construction has been undertaken on the land.) We cannot agree with appellant that the express language of § 18–5–207, W.S.1977, supra, required that the appellee not revoke its original permission despite the subsequent change in its zoning laws.

4 Antieau, Local Government Law, County Law, § 35.11, p. 128 (1966), is helpful:

---

1. The stipulated facts state the amendment required a density of one residence per three acres. However, the exhibit attached to the amendment shows the density requirement to be no more than three dwelling units per acre. At any rate, regardless of whether the density requirement is three acres per unit or three dwellings per acre, the modified proposal for the development involved 350 units on 50.7 acres of land, and that density was clearly in excess of the density requirement.

"Mere possession of a building permit confers no vested rights upon the recipient and even thereafter, the county can amend its zoning ordinance to outlaw the activity or structure covered by the permit. However, where a valid permit has been followed by substantial construction or irrevocable contractual commitments courts speak of a vested right and equitable estoppel and deny counties authority to revoke the permit or outlaw the activity or structure at the permitted site. . . ."

A California Supreme Court decision interpreting a statute similar to our § 18–5–207, supra, is also helpful. *San Diego County v. McClurken*, 37 Cal.2d 683, 234 P.2d 972, 974–977 (1951). A businessman had some gasoline storage tanks on his property prior to a zoning-law change which prohibited such a use of the property. The tanks already there were uncontestedly "grandfathered." The businessman, after the zoning change, built additional tanks and the city initiated suit. The businessman argued that the use of the property for storing gasoline had been grandfathered, but the California Supreme Court rejected this argument and held that only the original tanks were grandfathered. Despite the businessman's contention that he had intended to construct more tanks as soon as possible, the court held that he had no vested right to build more tanks since he had not begun construction of the tanks *before* the zoning-law change.

We have encountered a number of cases in which the county or a similar authority was estopped from revoking its prior approval of a development; however, in all of these cases the estoppel was conditioned upon actual construction having been performed in reliance upon the earlier approval. *Prince George's County v. Blumberg*, Md.Ct.Spec.App., 407 A.2d 1151 (1979); *Boise City v. Blaser*, 98 Idaho 789, 572 P.2d 892 (1977); *Kaeslin v. Adams*, Fla., 97 So.2d 461 (1957); and *Griffin v. County of Marin*, 157 Cal.App.2d 507, 321 P.2d 148 (1958).

*Boise City*, supra, is particularly helpful. Discussing Idaho law, the court said:

"When a zoning ordinance is enacted, it cannot outlaw previously existing nonconforming uses . . . The non-conforming use must, however, be one which already exists, not one which is merely contemplated . . . Such is the balance which is struck between private property rights on the one hand, and, on the other, the right of a municipality to exercise its police power by enacting a zoning ordinance in behalf of the general welfare . . . It follows that the correct rule . . . is:

"' . . . While a landowner who merely obtains a building permit is not protected against a future zoning change, he will be protected if, in reliance on the permit or the existing zoning, he has made substantial expenditures or otherwise committed himself, to his substantial disadvantage, before the zoning is changed. Annot., 49 A.L.R.3d 13, 20 (1973).'" 572 P.2d at 894.

See, also, *Rogin v. Bensalem Township*, 3 Cir., 616 F.2d 680 (1980).

In view of the above authorities, we must conclude that appellant had no vested right to construct the partially approved project at the time the appellee-Board changed its zoning requirements. This brings us to the conclusion that the Board, in approving the final plat and issuing the planning certificate, acted in violation of its own regulations without adequate legal justification.

Section 18–289.3, W.S.1957, 1975 Cum. Supp. [now § 18–5–203, W.S.1977] specifically provides, in part, that

" . . . no zoning certificate shall be issued unless the plans for the proposed building, structure or use fully comply with the zoning regulations *then in effect*. . . ." (Emphasis supplied.)

It, therefore, follows that the issuance of the certificate and approval of the final plat was unlawful.

Even so, we are left with the need to make fuller and further comment. We hear the appellant's argument that the en-

tire process has operated unfairly to its detriment. It is true that the appellee, although hostile to appellant's proposed development, concluded that the lack of enforceable regulations forced it to give initial approval to the proposed development. Then, while appellant was undertaking to satisfy the county's administrative requirements, the Board enacted an enforceable zoning regulation. The appellee completed its approval of the project and then took the position that its approval was invalid. Should the law condone this behavior on the part of the Board?

A number of comments are in order.

■ First, there is no evidence that the Board acted in bad faith. Appellee intended to honor its approval until sued by third parties contesting that approval. When the district court declared that appellee had acted unlawfully in approving the project, it was not in any sense improper for the appellee to heed the court's position.

Second, as discussed above, we are basing the exercise of our jurisdiction—and justifying the jurisdiction of the district court which ruled below—not on appellee's counterclaim, but on appellant's own request for declaratory judgment, which we construe to be broad enough to support—indeed to require—the judgment of the district court.

Third, it becomes appropriate to ask whether the appellee achieved a result through this unusual chain of events that it could not have achieved directly. In other words, if we assume that appellee had no enforceable regulations to prohibit appellant's project proposal in 1973, did appellant have a right to approval of its project, despite appellee's apparent belief that approval was not in the interests of the general welfare?

■ In *Schoeller v. Board of County Com'rs*, Wyo., 568 P.2d 869, 878 (1977), we stated that § 18–289.1, W.S.1957, 1975 Cum. Supp. [now § 18–5–201, W.S.1977], gives counties either express or implied power to enact a "freeze-resolution," without notice and hearing, providing that such a freeze is only for a reasonable length of time.

*Schoeller* says that a county can impose a temporary building and development freeze if some time is needed to draw up comprehensive regulations. Thus, under *Schoeller*, the absence of valid county zoning regulations at a particular time does not force the county to accede to a particular proposed development, in view of the fact that the county has the authority to stop development for any reasonable amount of time required to properly promulgate regulations. This is, of course, simply a more specific statement of the general rule that a property owner has no vested right (which will withstand a later zoning regulation) in a development which is merely contemplated.

We conclude that there is no inherent unfairness in holding that the issuance of the certificate and approval of the final plat for appellant's project was unlawful and that the law dictates such a holding.

## THE VALIDITY OF THE DENSITY REQUIREMENT

There remains the issue, raised only by the dissent, of the validity of the December 11, 1973 amendment which imposed a density requirement on new developments. The fact that this issue was not presented to us in appellant's brief would dispose of the issue for the author of this opinion. However, not all members of the majority agree that such a simple disposition is warranted. Accordingly, it becomes necessary to discuss this issue in some detail.

The dissent finds that the density requirement was ineffective for two reasons. First, it attacks the density requirements as an improper exercise of power by the Board. Second, the dissent argues that the amendment expired without any further action upon the passage of 160 days.

### The Board had Authority to Enact the Density Requirement

As discussed in paragraph 5 of the stipulation, reproduced supra, the Board of County Commissioners, in 1970, adopted a Master Plan for development of the county. From our review of the Master Plan, it is

clear that the plan was advisory and philosophical; it was not, nor was it intended to be, enforceable legislation or regulation. Also, as mentioned in paragraph 5 of the stipulation, the Board, in 1972 adopted a subdivision resolution to become effective in early 1973. According to our review of this document, we conclude that it imposed no valid substantive requirements for subdivisions contemplated under the facts of this case. As described in paragraph 14 of the stipulation, the Board, on December 11, 1973, amended the subdivision resolution which it had enacted in 1972. The amendment imposed a density requirement of no more than three residential units per acre. (See fn. 1, supra, for an explanation of the discrepancy between this statement and the stipulation.)

The dissent has created the strawmen of zoning and planning and then has explained why the subdivision resolution (and its amendment) was neither of those.

The statutory justification for the resolution and amendment is §§ 18–289.1 through 18–289.9, W.S. 1957, 1975 Cum.Supp. [now §§ 18–5–201 through 18–5–207, W.S.1977.]

Section 18–289.1, supra, states:

"*In order to promote the public health, safety, morals and general welfare, the board of county commissioners of any county shall be and hereby is authorized to regulate and to restrict the location and use of buildings and structures and the use, condition of use or occupancy of lands for residence, recreation, agriculture, industry, commerce, public use, and other purposes in the unincorporated area of the county.* It is provided, however, that nothing in this act [§§ 18–189.1 to 18–289.9] shall be construed to contravene any zoning authority of any incorporated city or town and no zoning resolution or plan shall prevent any use or occupancy reasonably necessary to the extraction or production of the mineral resources in or under any lands subject thereto." (Emphasis supplied.)

▆▆ We read the very lucid first sentence of the statute to mean that the board of county commissioners, acting as the board, has power to regulate and restrict the use and location of buildings. The dissent says that this statute "does not pertain in any manner to subdivision control." We cannot agree. The language is a broad grant of authority. As the dissent points out, zoning power derives from the State's police power. We think it abundantly clear that the statute just quoted delegates whatever police power is necessary to promulgate a subdivision, zoning, or planning ordinance. The dissent contrasts the statutes just cited with §§ 18–5–101 through 18–5–107, W.S.1977, a current subdivision-control law which was not in effect during the time pertinent to this case. But no inherent barrier is apparent that would have prevented the board of county commissioners from adopting the same provisions that now appear in §§ 18–5–301 through 18–5–310, W.S.1977.

Under our statutory and case law, there are two ways for the county board to exercise the regulatory power delegated to it by the legislature under § 18–289.1, supra. This statute states that the board may create a planning and zoning commission. Sections 18–289.3 and 18–289.4, supra [now § 18–5–202(b) and (c), W.S.1977], provide for the planning and zoning commission to prepare and present to the board a comprehensive plan; certain procedural requirements (a public hearing and notice) are imposed on the planning and zoning commission.

In addition to the above-described statutory procedure, we held in *Schoeller*, supra at 874, that § 18–289.1, supra, gives the board "implied power to do those things which would make its express power to regulate and restrict the use of buildings and land in unincorporated areas of the county meaningful." In that opinion, we held that the county board could freeze *all* development for a limited time until a planning and zoning commission could draft appropriate regulations to protect the unincorporated areas of the county from unplanned development. However, in *Schoeller*, the majority held that such a freeze could not continue for five years without a

public hearing. The *Schoeller* majority compared the five-year freeze with confiscation of property. (The *Schoeller* dissent would have gone even further and argued that the county board's implied powers were great enough to enforce a five-year freeze while comprehensive regulations were being developed.)

The density requirement, whose validity the dissent in this case, *sua sponte*, contests, was denominated as an emergency resolution. A requirement of no more than three dwelling units per acre of land in unincorporated areas of the county is far less intrusive and onerous than a freeze on all development. Indeed, a density requirement of no more than three residential units per acre of land, unlike a freeze on development, might easily become a permanent regulation without giving rise to any reasonable constitutional challenge that the regulation is a confiscation of property.

■ We think it is clear that the density requirement amendment was authorized by the statute. Unquestionably, it is sustained by the county board's implied powers under *Schoeller*, supra.

Since the dissent focuses on the original resolution rather than the amendment, it is appropriate to confront the argument that an amendment to an invalid original resolution had no force. First, there were procedural requirements in the original resolution, the validity of which the dissent does not contest. These requirements gave the original resolution a vitality even if the resolution's substantive directives were too vague to be enforced. It is to be observed that the original resolution had a savings clause. Second, we cannot see why the savings clause of the original resolution could not operate to save the amendment if the entire original resolution were struck down. Third, the Board's implied powers under *Schoeller*, supra, gave it power to enact the emergency density requirement independently of the original resolution.

The dissent attacks the resolution (and presumably the amendment) as not being comprehensive enough and complains that "[i]t is applicable only to subdivisions. The requirements contained in it do not apply to designated zones of districts in the county in a comprehensive manner . . . ." We think the discussion of *Schoeller* adequately rebuts the dissent's argument about comprehensiveness if the burden of the argument is that the requirement of comprehensiveness comes from §§ 18–289.2 through 18–289.4 supra. Is the dissent questioning whether it is a reasonable legislative classification to temporarily impose a density requirement only on subdivisions? We are dealing predominantly with rural land (unincorporated areas of the county) and the most common way to crowd people into rural land is through subdivision. In *Washakie County School District No. One v. Herschler*, Wyo., 606 P.2d 310, 333 (1980), we said:

". . . [W]hen an ordinary [nonfundamental constitutional] interest is involved, then a court merely examines to determine whether there is a rational relationship between a classification . . . and a legitimate state objective. . . ."

Neither the parties nor the dissent have presented any argument to the effect that it is irrational to impose a density requirement on subdivisions in order to avoid undesirable development.

Secondly, it is argued that the resolution does not comply with the statutory authority it relies on. § 18–289.1, et seq., supra. It is urged that the resolution contains water-supply and sewage-regulation provisions which are properly regulated under another statute with different procedures. The dissent does not argue that the density requirement is solely a water-supply or sewage-regulation requirement. Therefore, in light of the severability clause discussed above, we fail to see the relevance of this argument.

Third, the dissent argues that the resolution is too vague. But the density amendment is not at all vague.

### The 160-Day Issue

The two actions by the county board which are the subject of dispute here are its

final approval on July 1, 1974, of the appellant's subdivision plat for its proposed project and the Board's April 3, 1974, issuance of a planning certificate for the project. (Earlier, the Board had given its initial approval to the project; and we can all assume that prior to the passage of the density amendment, the Board acted lawfully in giving original approval to the proposed project.)

As previously discussed, on December 11, 1973, the Board passed an amendment to the original resolution imposing a density requirement on all new subdivisions of no more than three units per acre. The minutes of the meeting at which this amendment was adopted contain the following:

"After the three hour discussion the following motion was made by Mr. Brown:
"To accept the following Density Resolution for a period of 160 days.
"Mr. Ashley added an amendment, that at the end of the 160 day period, a survey be taken to determine which way the county wants to go.
"Ralph commented on the work that the other three on the Planning Board had done.
"Motion carried 2 to 1." (Exhibit 14.)

The dissenter apparently claims that it was a stipulated fact that the amendment was to be effective for only 160 days. Paragraph 14 of the stipulation, supra, does not so stipulate, and that is not the only possible conclusion to be drawn from these minutes.

The record does not reveal what, if any, action the Board took 160 days later. The amendment itself contains no language limiting its life span to 160 days. We think it proper to give the language of paragraph 14 of the stipulation its ordinary meaning and conclude simply that the resolution was amended.

■ However, even if the dissent is correct in assuming that the amendment was to extend for only 160 days, the planning certificate was issued within 160 days of passage of the amendment. Issuance of a valid planning certificate is a procedural requirement to subdivide land. See Article 1, Section 6, of the Resolution. The issued planning certificate was in conflict with a valid regulation and was, therefore, improperly issued. Thus, the district court was correct in declaring void appellant's authority to commence its subdivision project.

■ Further, the appellant argues that the amendment could not become effective until filed with the Secretary of State on February 1, 1974. If this is true and if, as the dissent argues, the amendment had a 160-day life span, then July 2, 1974, the date when the Board approved the final plat, fell within that 160-day life span if it is calculated from February. Thus, approval of the final plat was also invalid.

The judgment of the district court that "the Planning Certificate issued to the Plaintiff by the Defendant on May 3, 1974, and the plat approved and filed of record in the Office of County Clerk on July 1, 1974, in Book 1 of Maps, Page 9, as Plat No. 248, are of no force and effect. . . ." is affirmed. There is no need to rule on the correctness of the trial court's judgment that appellee's initial approval of the project was unlawful.

Affirmed.

ROONEY, Justice, dissenting, with whom RAPER, Chief Justice, joins.

Bad precedents set by the majority opinion include:

1. Approval of piecemeal zoning. Such zoning is unreasonable, arbitrary, confiscatory and not justifiable under the police power. Piecemeal zoning is not done pursuant to a comprehensive plan.

2. Not recognizing the distinction between zoning and subdividing.

3. Approval of a restriction imposed by a board of county commissioners on one particular use of property as a "freeze resolution." Legal "freeze resolutions" prohibit *all* changes in use of *all* unzoned property pending preparation of a *comprehensive* plan and the adoption of zoning requirements pursuant thereto.

The majority opinion refers to the procedural development of this controversy as "tortured." It is not as tortured as the path taken by the majority opinion leading to affirmance of the judgment herein. Before evidencing the tortured nature of that path and before specifying the law and reasons that support my contention that the three foregoing precedents set in this case are bad, I present the following as the basis upon which I would reverse the judgment of the trial court.

## BACKGROUND

Gradually increasing commercial, industrial, residential and people activity and growth in the state have resulted in piecemeal development of our statutory law in the area pertinent to this case. Some of our present statutes would have been helpful to the parties in this case had they been in force during the time period pertinent to it. To control such activity and growth, Teton County developed a land use plan which reflects much hard work and extensive thought. However, as I will later specify, the plan was not augmented with a zoning resolution as contemplated by law and by the plan itself. Appellee adopted a resolution which was labeled a "subdivision" resolution but which record indications reflect was thought to be a "zoning" resolution. The distinction between the two was seemingly not recognized. The resolution cannot stand as a "zoning" resolution, and the provisions of it are so far beyond that authorized by the subdivision enabling statute that it cannot stand as a "subdivision" resolution.

The resulting effect on appellant's subdivision effort will be detailed later. I now note that the record indicates a sincere effort by appellee to act legally in approving appellant's plat and to also comply with the law in taking the position in this case that such approval was not proper. The record additionally indicates appellant's continued efforts to comply with appellee's requirements within the subdivision posture as established by it before the effective date of the resolution.

## FACTS

Of the facts stipulated to by the parties, the following chronology sets forth that which is pertinent to the disposition of the case:

| | |
|---|---|
| August 1, 1967 | Appellee adopted a resolution relating to approval of subdivision plats pursuant to the only subdivision enabling legislation in effect during the period pertinent to this matter, i.e., §§ 34–12–101 through 34–12–115, W.S.1977 (then §§ 34–112 through 34–126, W.S.1957—originally enacted in 1876). |
| November 19, 1970 | Appellee approved a Master Plan for Teton County. |
| December 6, 1972 | Appellant partnership was formed for the purpose of acquiring and developing approximately 50.7 acres of land owned by it in Teton County "for condominium, apartment, townhouse and commercial purposes in accordance with plans and specifications earlier prepared." Purchase price was $225,044.44, and appellant expended $56,422.74 in formulating a development plan for it and in securing planning, environmental and economic feasibility studies for it. |
| January 1, 1973 | Effective date of "Resolution for Subdivision of Land for Teton County, Wyoming" (hereinafter referred to as "1973 resolution") which was adopted by appellee on October 3, 1972. It purported to be authorized by §§ 18–5–201 through 18–5–207, W.S.1977 (then §§ 18–289.1 through 18–289.9, W.S.1957 as amended, and originally enacted in 1959). It provided, among other things, that "[N]o standards are given for lots in subdivisions for multi-family, planned unit development, mobile home, commercial or industrial purpose." |
| January 1973 | Appellant filed: (1) the application for permit to subdivide its property, and (2) the proposed plat therefor. |
| June 1973 | Appellant filed a modified plat and proposal for the subdivision (the planning commission having rejected the first subdivision and having offered to consider a revised one). |
| October 18, 1973 | Appellee approved the plan (the matter had been considered and reconsidered at several meetings of the planning commission. The com- |

mission recommended disapproval of the application. The county attorney had advised that the Master Plan was properly adopted and that the 1973 resolution had density requirements only for single family residential lots).

| | |
|---|---|
| December 11, 1973 | Appellee amended the 1973 resolution, which amendment provided a density requirement of mimimum area of one-third acre for single-family residential and maximum density of three dwelling units per acre for multi-family dwelling units and mobile home parks. The amendment was to be effective for 160 days. |
| February 1, 1974 | The 1973 resolution and the amendment to it were filed with the Secretary of State. |
| April 3, 1974 | Appellee issued a planning certificate to appellant for the subdivision. |
| July 2, 1974 | Appellee approved the final plat for appellant's subdivision, and it was filed. |
| November 12, 1974 | A judgment was entered in a lawsuit against appellee by six parties in the District Court, Teton County, declaring subdivision permits acted on by appellee to have been improperly issued. Thirty-seven such permits had been issued. Appellant was not a party to that lawsuit. |
| December 6, 1976 | This action was started. |
| January 1, 1978 | Appellee adopted a Comprehensive Plan superseding the Master Plan which was approved August 1, 1967 and the 1973 subdivision resolution. |

## ISSUE

The ultimate issue presented to the court in this matter is whether or not appellant has a properly approved plat for its proposed subdivision whereby it can proceed with the development thereof. Stated another way, the question here presented is whether or not, as a matter of law, the trial court erred in deciding that appellee's approval of appellant's subdivision plat was illegal and not in accordance with then existing subdivision regulations.[1]

## PLANNING, ZONING AND SUBDIVISION LAW

Some of the difficulty which the Board of County Commissioners and appellant encountered in attempting to legally and properly proceed in this matter lies in the complexity of statutory direction in the area of county planning, zoning and subdividing.

Planning, zoning and subdividing are closely interrelated. Yet they are separate concepts. *Rockhill v. Township of Chesterfield, County of Burlington*, 23 N.J. 117, 128 A.2d 473 (1957). To apply the existing statutes to a given situation, it is necessary to keep the separate concepts in mind.

"While planning and zoning are sometimes considered to be so closely related as to be a single concept, the two terms are not interchangeable since they do not cover identical fields of municipal endeavor. Although municipal planning embraces zoning, the converse is not necessarily true. Thus, an early case described zoning as a separation of a municipality into districts and the dedication of the districts delimited to particular uses designed to subserve the general welfare. Planning, on the other hand, was said to connote 'a systematic development contrived to promote the common interest in matters that have from the earliest times been considered as embraced within the police power.'

" 'Planning,' in the broad sense, contemplates the development of an overall program for the future physical development of the total area and services of the municipality. Planning thus embraces more than a suggested pattern of land use; it may involve the consideration of all the usual public improvements and services that go into making up the modern community or urban area. *Since planning usually involves only proposals or blue-*

1. The disposition I would make of the case would make unnecessary consideration of incidental issues which were presented relative to the judgment in the previous case in which appellant was not a party.

*prints for future action, it does not ordinarily, without further implementation, impose any immediate restrictions.*

"Municipal zoning, on the other hand, is the result of effective municipal planning. By means of enforceable zoning regulations, the aims and objectives of overall municipal planning may be accomplished." (Emphasis supplied.) 1 Rohan, Zoning and Land Use Controls, § 1.02[3], pp. 1–14, 1–15 (1978).

"Broadly speaking, 'planning' relates to the systematic and orderly development of a community with particular regard for streets, parks, industrial and commercial undertakings, civic beauty and other kindred matters properly within the police power. 'Zoning' is primarily concerned with the regulation of the use of property, to structural and architectural designs of buildings, and the character of use to which the property or the buildings within classified or designated districts may be put. * * *" *Roberson v. City of Montgomery*, 285 Ala. 421, 233 So.2d 69, 72 (1970). Accord *State ex rel. Kearns v. Ohio Power Co.*, 163 Ohio St. 451, 127 N.E.2d 394 (1955).

"It should be realized that while there is a definite and harmonious relationship between planning and zoning, as is evidenced by the statutory provision, * * that one commission can do both, there does not seem to be any logical reason why 'zoning' should be used when 'planning' is meant. There is a distinction as well as a difference between them. * *'" *Kiska v. Skrensky*, 145 Conn. 28, 138 A.2d 523, 525–526 (1958).

Zoning is almost exclusively concerned with *use* regulation. *City of Baltimore v. Poe*, 224 Md. 428, 168 A.2d 193 (1961); *Dexter v. Town Board of Town of Gates*, 36 N.Y.2d 102, 365 N.Y.S.2d 506, 324 N.E.2d 870 (1975). Density is a proper element of zoning. *Chicago Title and Trust Company v. City of Chicago*, 130 Ill.App.2d 45, 264 N.E.2d 730 (1970).

Subdivision control is applicable only when subdivision of land is attempted. Originally, the only restrictions thereon had

to do with technical requirements. An example is the enactment of §§ 34–12–101 through 34–12–115, W.S.1977. They concern such items as methods of describing and numbering the subdivided parcels, nature of certificates, dedication effect of designation of streets, et cetera.

In recent years, the purposes of subdivision control have greatly expanded. It has become a tool to implement the planning process. Modern subdivision regulations include items such as "layout of streets; street width; street grading and surfacing; drainage; sidewalks; sewers; water mains; lot size; screen plantings; and the reservation or dedication of land for recreational or other purposes." 7 Rohan, Zoning and Land Use Controls, § 45.01[1], p. 45–5 (1979).

Wyoming now has a subdivision control law for unincorporated areas in each county, i. e., §§ 18–5–301 through 18–5–315, W.S.1977. But the act was not in effect during the time pertinent to this case.

There were two zoning enactments in effect during the time pertinent to this case. Both are still in effect. Sections 18–5–101 through 18–5–107, W.S.1977, is a *zoning* law authorizing the board of county commissioners to zone all or part of the unincorporated territory within the county "for the regulation of sanitary facilities for buildings and other structures. Sanitary facilities means domestic water supplies, sewage disposal * * *." Section 18–5–105(a), W.S.1977. It provides for the appointment of a county planning committee to research, plan and make recommendations relative thereto, and it provides that zoning districts in areas having residents must be approved by a majority of the voting residents of the district.

The actions of appellee in this matter were taken without reference to this enactment.

The second enactment, and the one recited in the 1973 resolution as authority for adopting the resolution, i. e., §§ 18–5–201 through 18–5–207, W.S.1977, is also a zoning and planning law. It does not pertain in any manner to subdivision control. It

authorizes the board of county commissioners to "regulate and restrict the location of buildings and structures and the use, condition of use or occupancy of lands for residence, recreation, agriculture, industry, commerce, public use and other purposes in the unincorporated area of the county." It also authorizes the appointment by the board of a planning and zoning commission, which commission is empowered to prepare a "comprehensive plan including zoning" together with recommendations "to effectuate the planning and zoning purposes." Pursuant to it, the board of county commissioners may adopt the planning *or* zoning recommendation. The enactment provides that:

"It is unlawful to locate, erect, construct, reconstruct, enlarge, change, maintain or use any building or use any land within any area included in a zoning resolution without first obtaining a zoning certificate from the board of county commissioners and no zoning certificate shall be issued unless the plans for the proposed building, structure or use fully comply with the zoning regulations then in effect. The board of county commissioners shall act promptly upon any application filed with it and shall grant certificates when the proposed construction or use complies with the requirements of the zoning resolution. If it denies the application, the board shall specify the reasons for such denial. The decision of the board of county commissioners may be reviewed by the district court and by the supreme court upon appeal in the same manner as provided in W.S. 15–626, for review of decisions of boards of adjustment." Section 18–5–203, W.S.1977.

It is noted that the illegal acts are with reference to the *zoning* resolution, not the *planning* resolution, and that the board is empowered to adopt either or both a planning or a zoning resolution. The distinction is in keeping with common sense and the nature of the two concepts. As recited above, planning "involves proposals or blueprints for future action." Such is hardly subject to restrictive legislation, ordinances or resolutions. The danger of vagueness, uncertainty, or indefiniteness to a degree of rendering such void is obvious. *Midwest Hotel Co. v. State Board of Equalization*, 39 Wyo. 461, 273 P. 696 (1929); *Yeik v. Department of Revenue and Taxation*, Wyo., 595 P.2d 965 (1979).

Finally, with reference to these two acts, we have held that they cover separate subjects and provide authority to accomplish different objectives. The first having to do with zoning regulation of sanitary facilities (domestic water supply, sewage, et cetera), and the second having to do with the other aspects of conventional zoning (use of buildings and lands, location of buildings, et cetera). *Carter v. Board of County Commissioners of County of Laramie*, Wyo., 518 P.2d 142 (1974).

Before applying the law to the facts of this case, reference is made to two other legal areas.

1. Zoning and related laws find their justification in police power. Such power is that of the state and delegation of such power is only to the extent as set forth in the statute. *Rockhill v. Township of Chesterfield, County of Burlington, supra*, 23 N.J. 117, 128 A.2d 473 (1957); *City of Scottsdale v. Superior Court in and for County of Maricopa*, 103 Ariz. 204, 439 P.2d 290 (1968); *Kline v. City of Harrisburg*, 362 Pa. 438, 68 A.2d 182 (1949). Since such laws affect the property rights of individuals and are in derogation of the common law, they are strictly construed. *Markle v. Williamson*, Wyo., 518 P.2d 621 (1974); *Mahaney v. Hunter Enterprises, Inc.*, Wyo., 426 P.2d 442 (1967); *Gulf Oil Corporation of Pennsylvania v. Warminster Township Board of Supervisors*, 22 Pa.Commw. 63, 348 A.2d 485 (1975).

2. "Zoning" anticipates zones or districts on which varied restrictions for building and use are imposed. A zoning ordinance or resolution must be reasonable and not arbitrary or capricious. *Henry v. White*, 194 Tenn. 192, 250 S.W.2d 70 (1952); *Cassell v. Lexington Township Board of Zoning Appeals*, 163 Ohio St. 340, 127 N.E.2d 11 (1955). It must be comprehensive.

" * * * An ordinance, for instance, which restricts the use of property only in one single block of a municipality is not, per se, a zoning ordinance." 1 Yokley, Zoning Law and Practice (4th ed.), § 3–5, p. 38 (1978), citing cases.

" * * * [T]he purpose of a zoning law is to devote general areas or districts in cities to selected uses." 1 Yokley, supra, at § 2–2, p. 20, citing cases.

"Fundamentally, we must understand that the legal basis for zoning, as an attribute of the police power, is a comprehensive zoning ordinance passed pursuant to a proper enabling statute or constitutional authorization. These are cardinal requisites and must always be present in any program of municipal or county zoning. If an ordinance has for its purpose the zoning of a municipality, it must be comprehensive. An ordinance, for instance, which restricts the use of property only in one single block of a municipality is not, per se, a zoning ordinance." 1 Yokley, supra, at § 5–2, p. 215, citing cases.

## RATIONALE

Applying the law to the facts of this case, I would find that the 1973 resolution cannot stand as a zoning resolution for any one of three reasons:

First, it is not comprehensive. It is applicable only to subdivisions. The requirements contained in it do not apply to designated zones or districts in the county in a comprehensive manner. It is captioned "Resolution *for Subdivision* of Land for Teton County, Wyoming" (emphasis supplied). It contains many requirements which are normally incident to zoning regulations, but the only result of a failure to comply with such requirements is a denial of approval of a subdivision plat. One not subdividing may use his land contrary to the Master Plan without violating any restriction imposed by the 1973 resolution. Normally, if a comprehensive zoning ordinance is first made effective, subsequent subdividing ef-

forts must comply with it in addition to other technical requirements of a subdivision ordinance. The zoning restrictions are then comprehensive.

Second, it does not comply with the requirements of the enabling zoning statutes. It contains provisions relative to water supply and sewage disposal which are specifically subject to zoning only under §§ 18–5–101 through 18–5–107, W.S.1977 [2] (see *Carter v. Board of County Commissioners of Laramie County, supra,* 518 P.2d 142), and is ineffective as it pertains thereto inasmuch as the matter was not submitted to district vote.

Third, because its provisions relative to zoning requirements are too vague and indefinite to be enforceable. It adopts most of such provisions by reference to the Master Plan. Article III, § 2 of the resolution directs that consideration of the proposed subdivision plat be "to assure that the subdivision: * * *

"D. Is in conformance with the adopted Master Plan, or any adopted portions thereof."

The Master Plan itself cannot serve as a zoning resolution.

" * * * [A] comprehensive plan does not have the legal effect of a zoning ordinance; the former is recommendatory and only the latter is regulatory. * *" *Nicholas, Heim & Kissinger v. Township of Harris,* 31 Pa.Commw. 357, 375 A.2d 1383, 1385 (1977).

The difference and distinction between planning and zoning has already been evidenced, as has the fact that planning "does not ordinarily, without further implementation, impose any immediate restrictions." Thus, the plan approved on November 19, 1970 did not impose any restrictions. Even if the approval of it were meant to be a zoning resolution or an "implementation" of the plan, such could not be in view of the general and indefinite language in the plan which was adopted by reference to it. Such language itself reflects this limitation and

**2.** Water supply and sewage disposal are regulated and controlled in Article III, § 2 A, Article IV, § 2 B 5, Article IV, § 2 B 6, Article IV, § 2 C 8, and Article IV, § 2 D 4 of the 1973 resolution.

the anticipation of adoption of specific zoning regulations. It reads in part:

"Since the proposals contained in the Master Plan *are advisory rather than mandatory*, these guidelines *should be put into effect through the adoption of laws and policies* which reflect the concepts formulated in the Master Plan. New or improved subdivision regulations, building code and inspection procedures, and *zoning ordinances should be considered* by elected officials as means to *accomplishing the objectives presented in the Master Plan.*

\* \* \* \* \* \*

"As emphasized on the first page of this report, none of the proposals of the Master Plan can be imposed on property owners. *Unless adopted later in the form of codes or ordinances, these proposals will remain as recommendations only.* \* \*

\* \* \* \* \* \*

" \* \* \* [T]he elements outlined in the Master Plan must be expressed more forcefully in the form of a *more specific land use plan which can be enforced through the adoption of restrictive zoning statutes.*

\* \* \* \* \* \*

"It should be understood that the Master Plan is basically very general in nature. \* \* \*

\* \* \* \* \* \*

"There are also legal and administrative tools which the County should consider in achieving its planning objectives. *Among these are zoning, regulation of land subdivision*, and open space planning programs. \* \* \*

"*By contrast to the general standards and guidelines contained in the Master Plan, a zoning ordinance is specific and can be legally enforced.* \* \* \* Because of its control over land uses, building heights and volumes, and yards and open spaces, a zoning ordinance could be extremely important in protecting property owners from undesirable development.

\* \* \* \* \* \*

"Subdivision regulations are laws which govern the process of converting. raw land into building sites. \* \* \*" (Emphasis supplied.) Master Plan for Teton County (1970).

It is obvious from a review of the Master Plan that it is not designed to establish enforceable requirements. It anticipates adoption of zoning regulations having to do with land and building uses, density and standards. It also anticipates later adoption of subdivision regulations.

In discussing the controls of suggested subdivision regulations, the plan refers to requirements relative to water supply, sewage disposal, street, and utility and drainage systems, parks and school sites—but not to land use or density.

I would hold that the *zoning* provisions contained in the October 3, 1972 resolution must fail. They cannot be effective or enforceable.

I would also hold that the resolution cannot stand in its entirety as a subdivision resolution. First, because it purports to enact regulations (mostly in the zoning area) much beyond the police power delegated in §§ 34–12–101 through 34–12–115, W.S.1977, the only subdivision law then in effect. Only a reasonable implementation of such law is legal. *Prudential Trust Co. v. City of Laramie*, Wyo., 492 P.2d 971 (1972). Second, because it is subject to the same vagueness and indefiniteness which makes it defective as a zoning resolution. Third, and tied in with the other reasons, because most of its provisions concern zoning, and such provisions may fail for the same reasons that the resolution is defective as a zoning resolution.

Article VI, § 6 of the 1973 resolution is a "separability clause" specifying the intent to maintain in force and effect those provisions of the resolution not declared invalid by court decision, should some provisions be so declared. Giving effect to this separability clause, only the provisions of the resolution within the scope of §§ 34–12–101 through 34–12–115 (the only subdivision legislative enactment in force at the time of

adoption of the resolution) remain in force and effect and applicable to appellant's application. Otherwise, the entire 1973 resolution would fail, including the provision in Article VI, § 5 expressly repealing the subdivision resolution of August 1, 1967 and, thus, leaving the August 1, 1967 resolution in force and effect. Either way, appellant's application and the approval of the subdivision plat would be in conformance with the subdivision resolution in force and effect at the time. To give effect to the separability clause would emasculate the resolution and pervert the obvious intention for its passage. I would hold the entire 1973 resolution invalid, leaving the August 1, 1967 resolution as the only one in force and effect. Since appellant's plat and permit were in conformance with the 1973 resolution, it was in accordance with the regulations and standards legally in effect at the time.

Accordingly, I would reverse the judgment of the trial court and remand for the purpose of entering a judgment declaring that the plat approved and filed of record in the office of the Teton County Clerk on July 2, 1974 in Book 1 of Maps, page 9, as Plat No. 248, was legally and properly approved and is valid and in effect.

### RE MAJORITY OPINION

The majority opinion is predicated entirely on the proposition that the December 11, 1973 amendment, independent of the original 1973 resolution, was proper and legal. But it was not proper and legal.

1. The amendment must fail as piecemeal zoning in the same fashion as must the original 1973 resolution. Zoning must be comprehensive and not piecemeal. If otherwise, it is arbitrary and unreasonable

and, thus, invalid. *Shapiro v. City of Cambridge*, 340 Mass. 652, 166 N.E.2d 208 (1960); *Vernon Park Realty v. City of Mount Vernon*, 307 N.Y. 493, 121 N.E.2d 517 (1954); . *Alabama Alcoholic Beverage Control Board v. City of Birmingham*, 253 Ala. 402, 44 So.2d 593 (1950); *Scarborough v. Mayor and Council of Town of Cheswold*, Del.Ch., 303 A.2d 701 (1973). The amendment applies only to subdivisions and it applies only to density requirements thereof. The very language of the amendment specifies that it is not a comprehensive plan.[3] The amendment was not pursuant to a comprehensive plan as required by § 18–5–202(b), W.S.1977 (part of §§ 18–5–201 through 18–5–207, W.S.1977, said by the majority to be "statutory justification for the resolution and amendment") which authorizes preparation and amendment of a "comprehensive plan including zoning." The consideration was well said in *Connell v. Town of Granby*, 12 A.D.2d 177, 209 N.Y.S.2d 379, 381 (1961):

" * * * Town Law, § 263 requires that zoning regulations 'shall be made in accordance with a comprehensive plan.' This direction is legislative recognition that piecemeal, haphazard or partial zoning does not satisfy the need of promoting the general welfare. Under appropriate conditions, the greater portion of a town may be regulated by a simple ordinance designating it as agricultural or residential or both, and a very small portion of the town may be beneficially adaptable to some other particular purposes. The wisdom of classification is for the zoning board and not for the courts. [Citations.] However, lacking any evidence of the existence of an over-all plan, as in the instant case, the trial court's conclusion that such a plan existed by

---

**3.** The amending resolution reads in part:
"WHEREAS: it is obvious to this Board that *there is a need for a Comprehensive Plan* for the development and growth of Teton County, * * *, and,
    *    *    *    *    *    *
"WHEREAS: this Board has been advised by the office of the County and Prosecuting Attorney that it may adopt a temporary plan as an emergency measure, and,

"WHEREAS: this Board realizes *it will take time to develop a comprehensive plan* and regulations for the areas to come under the plan,
"IT IS THEREFORE RESOLVED: that Article IV, section 3b of the 'Resolution for Subdivision of Land for Teton County, Wyoming', be amended * * *." (Emphasis supplied.)

implication appears to be based on conjecture and surmise. * . * * "

The majority opinion accepts the invalidity of the original 1973 resolution—at least insofar as it pertains to substantive matters.

An example of the discrimination, the arbitrariness and the unreasonableness of the situation is obvious from the following example:

If X owns forty acres of land in the county next to forty acres of land owned by Y, and X desires to subdivide, he could do so under the resolution with its amendment and as interpreted by the majority opinion only by complying with the density requirement. However, Y can build multiple rental units on his land without regard to density requirements inasmuch as he does not desire to subdivide.

We should not approve of piecemeal zoning.

2. The distinction between zoning and subdividing is real, and it is necessary to the orderly development of our law. By very definition, subdividing is *not* comprehensive and *is* piecemeal. It relates only to the parcel of land being divided. *Adams Tree Service, Inc. v. Transamerica Title Insurance Company*, 20 Ariz.App. 214, 511 P.2d 658 (1973); *McKain v. Toledo City Plan Commission*, 26 Ohio App.2d 171, 270 N.E.2d 370 (1971).

The majority opinion accuses me of creating "strawmen of zoning and planning" and then explaining "why the subdivision resolution (and its amendment) was neither of those." However, the majority opinion refers to the first sentence [4] of the second zoning enactment (§§ 18–5–201 through 18–5–207, W.S.1977) as the authority *for the subdivision resolution*. The second zoning enactment is a *zoning* enactment. Such is not only evident from its content, but it is specified in the titles of the original enactment in 1959 and the only amendment thereto in 1967. The 1959 title reads:

"AN ACT providing for the enabling of any county to provide for *zoning* within certain prescribed areas adjacent to incorporated areas for the purpose of promoting the public health, safety, morals and general welfare; declaring the purposes and scope of such *zoning*; providing for the exemption of all farming and ranching operations and of existing uses from the operation of the Act; authorizing a Board of County Commissioners to establish a *Zoning Commission*; prescribing the membership, organization, functions, and authority of the *zoning* commission; prescribing the procedure for enactment of *zoning* resolutions; providing for the issuance of *zoning* certificates; providing for enforcement of such *zoning* resolutions, including penalty for violation thereof; providing for appeals; and providing for the severability of the provisions of the Act." (Emphasis supplied.) Ch. 85, Session Laws of Wyoming, 1959.

The 1967 title reads:

"AN ACT to amend and re-enact Section 1, Chapter 85, Session Laws of Wyoming 1959, and Section 2, Chapter 85, Session Laws of Wyoming 1959, relating to *planning and zoning* by Board of County Commissioners for residential, recreational, agricultural, industrial, commercial, public and other purposes and extending the application of such *planning and zoning* power to buildings, structures and lands in all unincorporated areas of the county, and deleting the farming and ranching exemption from this act; to amend and re-enact Section 2, Chapter 85, Session Laws of Wyoming 1959, relating to the composition of the *planning and zoning* commission; to amend and re-enact Section 3, Chapter 85, Session

---

4. The quoted sentence reads:

"In order to promote the public health, safety, morals and general welfare, the board of county commissioners of any county shall be and hereby is authorized to regulate and to restrict the location and use of buildings and structures and the use, condition of use or occupancy of lands for residence, recreation, agriculture, industry, commerce, public use, and other purposes *in the unincorporated area of the county*." (Emphasis supplied.) The emphasized portion of the foregoing indicates the intention for comprehensive, and not piecemeal, application of the enactment.

Laws of Wyoming 1959, authorizing the county *planning and zoning* commission to prepare a *comprehensive zoning* plan for all unincorporated areas of the county." (Emphasis supplied.) Ch. 202, Session Laws of Wyoming, 1967.

The enabling provision relied upon by the majority opinion for the "subdivision" resolution and for the amendment thereto is a "zoning and planning" provision. The consideration of "zoning and planning" is the vital consideration in this case and not a "strawman" consideration. Established law relative to application of "zoning and planning" must be considered; and if the resolution or the amendment will not meet the accepted and necessary standards relative thereto established by law, they must fail.

The December 11, 1973 amendment cannot stand as a zoning or subdivision resolution independent from the original 1973 resolution for the same reason that the original 1973 resolution cannot stand as such. That the original 1973 resolution cannot so stand is established in the Rationale section of this dissent, supra. Nor did the appellee intend that the amendment stand separately. Such is reflected by the fact that it was enacted as an "amendment." It is not reasonable to assume that appellee intended the amendment to exist alone by virtue of the separability clause as an independent enactment and without any of the other provisions of the original 1973 resolution, when the original 1973 resolution was an eighteen-page single-spaced document containing sixteen articles, each with several sections and numerous subsections, and the only part thereof amended was one of seven sub-sub-subsections of eight sub-subsections of four subsections of two sections of "Article IV—Preliminary Plat."[5]

Accordingly, the distinction between zoning and subdividing is pertinent to the status of both the original 1973 resolution and the December 11, 1973 amendment.

3. Approval of the December 11, 1973 amendment on the basis of it being a legal

"freeze resolution" stretches the concept too far. The amendment applied only to one density requirement. It applied only to residence type improvements to be made in subdivisions—not in land not being subdivided. The noncomprehensive and piecemeal character of it has already been established. Beyond that, it does *not* freeze all use changes of *all* improved property in the county pending preparation of a comprehensive plan and adoption of zoning requirement pursuant thereto, as was done in *Schoeller v. Board of County Commissioners of County of Park*, Wyo., 568 P.2d 869 (1977)—the case relied upon by the majority opinion for its position. Such an all inclusive "freeze" is quite different than a restriction discriminating between some builders and some uses. There is a split of authority on the legality of even an all inclusive freeze. *Schoeller v. Board of County Commissioners, supra.* However, we have approved such in *Schoeller v. Board of County Commissioners, supra*, but the approval should not go so far as to legalize that obviously discriminatory and unreasonable. See *State ex rel. Fairmount Center Co. v. Arnold*, 138 Ohio St. 259, 34 N.E.2d 777 (1941); and *Matthews v. Board of Zoning Appeals of Greene County*, 218 Va. 270, 237 S.E.2d 128 (1977).

From the foregoing, the "tortured" path of the majority opinion becomes apparent. The tortured path holds the permit and plat are void because the land was not yet put to the authorized use when the December 11, 1973 amendment was enacted—even though the original 1973 resolution being amended was invalid and even though the same invalidating factors applicable to the 1973 resolution apply equally to the amendment, i. e., piecemeal zoning, not comprehensive, failure to comply with enabling zoning statutes, the area to be controlled is vague and indefinite, and the precepts relative to subdividing are being applied improperly to zoning. The tortured path holds that although there is no *zoning* restriction in ex-

5.   The amendment specified Article IV, Section 3b as that amended (see footnote 3). Actually, there is no section 3b in Article IV of the

original 1973 resolution. The language of the amendment itself indicates that it is probably intended to amend Article IV, Section 3 D 3 b.

istence, appellant's permit and plat are void because the land has not yet been put to its intended use—even though the position of appellant having expended money in complying with appellee's requests and the fact that the delay was occasioned by appellee and not appellant are to be considered, (revocation of permit is not possible after expenditures in reliance thereon, *Nott v. Wolff,* 18 Ill.2d 362, 163 N.E.2d 809 (1960); *Hull v. Hunt,* 53 Wash.2d 125, 331 P.2d 856 (1958); *Cos Corporation v. City of Evanston,* 27 Ill.2d 570, 190 N.E.2d 364 (1963); *Tantimonaco v. Zoning Board of Review of Town of Johnston,* 100 R.I. 615, 218 A.2d 480 (1966)). The tortured path holds the amendment proper as a "freeze" resolution—even though it is unreasonable and discriminatory and does not freeze all use changes. The tortured path holds the amendment to be comprehensive—even though its very words reflect the necessity for time in which to develop the comprehensiveness of the plan and even though the resolution applies only to subdivisions and to one aspect of a comprehensive plan. The tortured path holds that the motion to adopt the amendment "for a period of 160 days" does not limit its duration to 160 days—even though the language is plain and explicit. The tortured path holds that the planning certificate was issued within the 160-day period and, thus, the approved plan (approved before the amendment) and the approval of the final plat (approved and filed 42 days after the 160-day period) were ineffective—although the only requirement for a planning certificate comes from the original 1973 resolution which failed for the reasons already indicated, and although the approval of the final plat is the fulcrum necessary to proceed with development pursuant to *subdivision* requirements, and although the approval of the final plat was a ratification of the issuance of the planning certificate for whatever worth the certificate had.

All in all, the majority opinion runs a rough course in arriving at its conclusion.

Commenting briefly on the position expressed in the majority opinion that we are not at liberty to decide a case upon any point required by the ends of justice but must limit ourselves to the points raised on appeal by the parties, I note: (A) that appellant argued at length concerning the vague and indefinite character of the plan and the impossibility of using it for a zoning regulation; that the opinion letter of County and Prosecuting Attorney (now District Judge) Ranck, dated October 18, 1973, referred to in the stipulation and contained in the record and upon which the Board of County Commissioners relied in issuing the certificate to appellant, addressed the inability of the plan to operate as a zoning regulation and the vague and indefinite nature of the resolution which prevented its use in the manner proposed by appellee, and that appellee devoted two sections of its brief to argument that the provisions of the plan could operate as zoning provisions; and (B) that land use in Wyoming and the proper application of Wyoming statutes thereto is too important to warrant the closing of our eyes to the establishment of confusing and misleading precedent relative thereto, and that we have an obligation to decide cases and not just dispose of them. *Allen v. Allen,* Wyo., 550 P.2d 1137 (1976).

Finally, I want to emphasize that this dissent is not a disapproval of planning and zoning objectives of Teton County. Teton County properly began that necessary for needed land use control. A comprehensive plan was developed which exhibited extensive thought and much hard work. It was a comprehensive plan which concerned the entire county and almost all of the facets of land use. The next step in the normal course of events was to adopt a zoning resolution [6] in conformance with the provisions of the plan and *as specifically recommended* in the plan itself.[7] If so adopted, the zoning resolution would be specific. It

---

**6.** If provisions for "sanitary facilities" are to be included, two resolutions would be necessary, one under the first zoning enactment (§§ 18–5–101 through 18–5–107, W.S.1977), and one under the second zoning enactment (§§ 18–5–201 through 18–5–207, W.S.1977).

**7.** See section on Rationale, supra.

would not be vague and indefinite. If so adopted, use of all land in the county would be subject to its provisions, including the provision relative to density requirements. Since subdivided land would be subject to the zoning resolution provisions (as would all other land), a subdivision resolution, if adopted, would concern that usually addressed in such resolution, i. e., requirement that streets and alleys in the subdivision are of proper size and that they join already established streets and alleys; that adequate dedication is made for streets and parks; that parcels are properly numbered and described on the plat, et cetera.

As indicated in the other sections of this dissent I do not believe that a *zoning* resolution was ever adopted and the effort to include zoning provisions in the subdivision resolution fell short in the respects already noted.